618 F.2d 904
 UNITED STATES of America, Plaintiff-Appellant,
v.
BEDFORD ASSOCIATES, a partnership, Doris K. Carver and
Samuel Ades, Individually and as partners of
Bedford Associates, and Amcar Management
Corp., Defendants-Appellees,
The Bowery Savings Bank, Intervenor-Appellee.
The BOWERY SAVINGS BANK, Plaintiff-Appellee,
v.
BEDFORD ASSOCIATES et al., Defendants-Appellees,
and
United States of America, Defendant-Appellant.
 Nos. 250, 425 and 426, Dockets 79-6119, 79-6143 and 79-6175.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 5, 1979.
Decided Feb. 5, 1980.
 
 William J. Brennan, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty. for S. D. N. Y., Harvey J. Wolkoff, Peter C. Salerno, Asst. U. S. Attys., New York City, on the brief), for plaintiff-appellant.
 Frank H. Wohl, New York City (Eugene Zemp DuBose, Jr., Ronald Jay Litchman, Rosenman, Colin, Freund, Lewis & Cohen, New York City, on the brief), for defendants-appellees Bedford Associates, et al.
 Terence F. Gilheany, New York City (Howard R. Hawkins, Jr., Robert L. Sills, Vincent M. DiLorenzo, Cadwalader, Wickersham & Taft, New York City, on the brief), for plaintiff-appellee Bowery Savings Bank.
 Before VAN GRAAFEILAND and KEARSE, Circuit Judges, and DOOLING, District Judge.*
 KEARSE, Circuit Judge:
 
 
 1
 The United States appeals from various interlocutory orders entered by the United States District Court for the Southern District of New York, Henry F. Werker, Judge, in these consolidated actions involving a building occupied by the government and owned by defendant-appellee Bedford Associates ("Bedford"). The government formerly occupied the building pursuant to a lease which expired on October 31, 1978; it claims that a new lease agreement was entered into as of November 1, 1978. Bedford disputes the existence, or alternatively, the enforceability, of the new agreement. On March 20, 1979, Bedford notified the government that it planned to discontinue services to the building and to close it on March 23 unless the government agreed to pay a "reasonable and fair rent" for its occupancy. The government commenced suit on March 22 against Bedford and its agents, seeking preliminary and permanent injunctive relief against the threatened actions.
 
 
 2
 Meanwhile, on March 21, 1979, The Bowery Savings Bank ("Bowery"), the mortgagee of the property, commenced suit against Bedford and the government, seeking foreclosure of its mortgage and an assignment of rents. Bowery was allowed to intervene in the government's action, and eventually the two actions were consolidated.
 
 
 3
 A five-day hearing was held on the government's motion for a preliminary injunction against Bedford. Bowery supported the government's motion, but urged that it be granted only on condition that the government pay the rent to Bowery, and that such payments be made without any setoff by the government for its payment of utilities charges. The government expressed its willingness to pay the rent, but contended that it had the right to deduct its utilities payments from the rent payments. At the close of the hearing, the district court framed a preliminary injunction, filed on April 17, 1979, which, pending a trial on the merits, restrained Bedford and its agents from denying the government access and from terminating services to the building, and required the government to pay rent to Bowery and to bear the cost of all utilities without setoff from rent.
 
 
 4
 The government appeals, principally, from so much of the April 17, 1979 order as requires it to pay utilities without setoff from the rent, arguing that the district court was without jurisdiction to impose such a condition on the United States. The government appeals also from the denial of its motion by letter dated June 1, 1979, to require Bedford to post a bond. Appellees have moved for dismissal of the government's principal appeal for lack of appellate jurisdiction.[1] We hold that we have jurisdiction to hear the principal appeal, and that the district court had jurisdiction to enter the preliminary injunction. However, we conclude that the preliminary injunction must be modified with respect to the amount the government is to be required to pay, and therefore remand so that the district court may modify its order in accordance with this opinion.
 
 
 5
 * A. The Original Lease
 
 
 6
 Bedford, a partnership consisting of defendants-appellees Doris Carver and Samuel Ades, owns the twenty-one story office building at 120 Church Street in New York City.[2] Bowery holds a consolidated first mortgage on the premises. The entire building is occupied by the Manhattan District Headquarters of the Internal Revenue Service ("IRS").
 
 
 7
 In 1962, the United States General Services Administration ("GSA") executed a lease of the premises with Bedford. The lease had an initial ten-year term, from November 1, 1963, through October 31, 1973, with two five-year renewal options exercisable by the government on notice at least 180 days prior to the expiration of the lease term. The government exercised its first renewal option in 1973, after obtaining successive reductions of the notice period to 90 and 30 days, and after obtaining several extensions of the deadline for notice necessitated by delays in securing the required Congressional approval.[3] The government did not exercise its second renewal option.
 
 
 8
 The lease required annual rent payments of $1,949,500 during the first ten years, $2,115,499 during the first five-year renewal term, and $2,226,194 during the second five-year renewal term. Bedford was obligated to provide and bear the cost of various services, including electricity, cleaning, security, maintenance and repairs. It was also to provide and pay for heat, air conditioning and elevator service from 8 A.M. to 6 P.M. during the week, and to provide those services at other times for specified rates of additional compensation.
 
 
 9
 From time to time, and with increasing frequency during the first renewal term, Bedford complained about losses it assertedly was incurring in the operation of the building. One point of contention concerned the government's responsibility for certain electricity charges. Over the course of its occupancy, the government has installed a number of new office machines which consume electricity. Since this office machinery was not included in the government's original solicitation, the government was responsible for the cost of the electricity it used. However, it appears that the parties have never determined the precise extent of these excess costs. The government concedes in this Court that it remains responsible for some electricity payments for such consumption.
 
 
 10
 The government, for its part, has often sought changes in the building's physical plant. As a result, the parties entered into a series of supplementary agreements under which Bedford made various alterations to the building and was reimbursed for them by the government. Supplemental agreement number 24 is of more immediate concern than the others because it also dealt with payment of utilities expenses.
 
 
 11
 Under this supplemental agreement, dated December 15, 1975, the owners released the government from any claims for excess electricity consumption through that date, and agreed to make specified alterations on four floors of the building, in return for which the government agreed to assume the cost of all utilities, in addition to the specified amount of rent, for the remainder of the first renewal term, through October 31, 1978. At about the same time, Bedford and Bowery executed a forbearance agreement, under which the mortgage payments were reduced and Bowery obtained the right to an assignment of rents in the event of default.
 
 B. The Quest for a New Lease
 
 12
 By early 1977, Bedford was complaining that its losses were larger than ever. At the same time, IRS apparently had become quite dissatisfied with the 120 Church Street building. Thus, the government started looking for new premises. GSA conducted a market survey of lower Manhattan, and on the basis of information obtained from IRS, drafted a solicitation for bids which it sent to twelve potential offerors in June 1977. The solicitation called for offers of 317,000 square feet in lower Manhattan, to be occupied by IRS beginning November 1, 1978. GSA received three responses on the return date, August 15, 1977, one of which was a new offer from Bedford for the 120 Church Street building. GSA considered all three offers to be incomplete in various respects, and thus began to gather further information and to negotiate over terms with the three offerors. By December 1977, GSA had rejected the two other offers, leaving Bedford's new offer and the second renewal option as its only alternatives. The renewal option, for 369,000 square feet at an annual rent of $2,226,194, did not include the alterations needed to satisfy IRS.
 
 
 13
 Bedford's August 15, 1977 offer provided for 350,000 square feet at an annual rent of $3,073,000, and included various alterations which Bedford estimated would cost $1 million. GSA deemed the proposed alterations insufficient, and the offer was, on its face, for more space than the solicitation requested. (It later transpired that the parties disagreed on how the space was to be measured and, consequently, on how much space the building contained). The parties engaged in further negotiations. As these progressed, Bedford modified its offer by a series of letters. In a letter dated December 8, 1977, Bedford offered 317,000 square feet (with an option on 8000 more) for a fixed term of ten years, at an annual rent of $2,902,160,[4] with alterations estimated by Bedford to cost $2.6 million. In its original offer and in all modifications made during the following six months, Bedford was to pay for utilities.
 
 
 14
 As noted above, the solicitation requested that the premises be ready for occupancy on November 1, 1978. Nevertheless, the solicitation recognized that the contemplated renovations might not be completed by that date and required that they be completed no later than eighteen months after the date of the lease. This created a question as to what rental would be paid during the period between November 1, 1978, and the completion date. Bedford sent GSA two letters which specifically addressed this point. The first letter, dated November 18, 1977, proposed that rent be calculated, in effect, on a per floor basis: for each unrenovated floor Bedford would be paid at the second renewal option rate ($185,516 per month for the entire building); for each renovated floor, Bedford would be paid at the new lease rate ($241,847 per month for the entire building). Thus, the rental payments would escalate as construction progressed.[5] There was no suggestion in the November 18, 1977 letter that the government pay for utilities.[6]
 
 
 15
 The second letter, dated March 2, 1978, proposed a scheme of rental payments under which the government would continue paying at the rate then in effect i. e., the first renewal option rate ($176,292 per month) plus all utilities costs until completion of the renovation or eighteen months after execution of the new lease, whichever came first. There was testimony that Bedford and GSA had discussed this variation many times in December 1977 and January 1978, and that the March 2 letter was sent in response to GSA's suggestion that Bedford put the proposal in writing. GSA eventually responded, however, orally and by letter dated April 5, 1978, that it would not consider the March 2 proposal or any further revisions of Bedford's offer at that time, but that it would consider the March 2 proposal after the offer had been approved by Congress and the lease had been awarded to Bedford.[7] Bedford did not insist that the March 2 letter be included in its offer, but apparently chose to acquiesce in GSA's exclusion of the proposal.
 
 
 16
 GSA's April 5 letter brought to a temporary halt negotiations over the substance of Bedford's offer. Bedford argues that so many vital terms had been left inconclusive at this point including the amount of rent to be paid during the renovation period, the number of square feet in the building, the amount of space to be occupied by the government, and the extent of Bedford's responsibility for utilities payments that no lease was created when the government subsequently accepted the offer.
 
 
 17
 Alternatively, Bedford argues that any resulting lease was unenforceable because it was entered into under duress and because its terms were unconscionable. At the hearing below, Bedford witnesses testified that the various changes Bedford made in its offer were made at the instance of GSA under the threat of competition from other bidders (the seriousness and duration of which are alleged to have been misrepresented) and the threat that if the changes were not made, GSA would exercise the second renewal option under the old lease. The witnesses testified that all parties to the negotiations knew that such a renewal would have a disastrous economic impact on Bedford.[8]
 
 
 18
 GSA's solicitation had specified that all offers were to remain open until April 15, 1978. In February 1978, GSA obtained an extension of Bedford's offer until July 1, 1978. During the summer of that year GSA obtained several further extensions, and in the autumn GSA asked for and obtained extensions of both the time to accept Bedford's new offer, and the time to exercise the second renewal option under the old lease,[9] until October 31, 1978. Bedford repeatedly asserted during this period that the delay in obtaining Congressional approval was causing the costs of the proposed alterations to increase substantially.
 
 
 19
 GSA was notified on October 25, 1978, that Congressional approval had been obtained. On October 30, GSA delivered to Bedford a letter accepting Bedford's offer, which it identified as Bedford's August 15, 1977 submission "as amended by letters dated September 6, 1977, November 1, 10, 15, 17, 18 and 28, 1977, December 8, 1977, January 31, 1978 and February 1, 1978."[10] GSA's letter specified that the annual rental, covering all services, utilities and alterations, was to be $2,902,160. On November 14, Bedford wrote GSA, urging that Bedford be paid rent at that level immediately. On December 13, GSA presented Bedford with the proposed lease for execution. This lease consisted of a standard form "U.S. Government Lease for Real Property," GSA's solicitation for offers, Bedford's original offer, and the subsequent letter changes to that offer, including the November 18 letter but not the March 2 letter, and a rider specifying that pending renovations, the annual rent would be $2,226,194, or $185,516 per month. Bedford rejected the proposed lease by one of two letters to GSA dated December 15, 1978, on the ground that it did not conform with the solicitation and award. This letter did not elaborate on this assertion, other than to refer to a November 21, 1978 letter from Bedford to GSA which (1) pointed out that a premise of the government's solicitation and of Bedford's submissions had been that the renovation of at least several floors would have been completed by November 1, 1978, and (2) detailed the substantial increases in construction costs and financing costs that had occurred during the year. Bedford's other letter to GSA dated December 15, 1978 also detailed cost increases and concluded that the alterations originally estimated to cost $2.6 million would now cost an estimated $3.8 million.
 
 
 20
 After Bedford's rejection, the parties entered into renewed negotiations in which Bedford asserted that because of the government's delays, its current losses had become enormous. Bedford witnesses at the hearing below testified that at the time Bedford submitted its offer and during the subsequent negotiations in late 1977, they believed that work on the proposed alterations would commence in January, or at the latest April, 1978. They testified that due to escalating costs, the subsequent delays in obtaining Congressional approval had rendered their offer economically unfeasible. Thus, in Bedford's view, Bedford was entitled to relief from the terms of its offer.
 
 
 21
 The parties failed to resolve their differences through negotiation, and Bedford did not start work on the proposed alterations. The government paid rent at the second renewal option rate of $185,516 per month for November and December. In December the government decided to deduct utilities payments it was making from its rent checks to Bedford. Thus, the government tendered a check for January rent in the amount of $151,187, and a check for February rent in the amount of $133,220. For each month starting with November, Bedford notified GSA that it was accepting the rent checks "under protest."
 
 
 22
 On March 8, 1979, Bedford sent a letter to GSA asserting that the government owed additional rent of $12,278.64 per month, and excess electricity charges of $14,000 per month, for the four-month period from November 1978 through February 1979. The claim for additional rent was premised on the assertion that IRS had accepted, as completed for purposes of Bedford's new offer, the four floors renovated pursuant to supplemental agreement number 24, entered into in 1975. At the hearing below one of the GSA representatives testified that GSA was prepared, in the post-award negotiations in late 1978, to credit Bedford for completion of these floors.[11] The claim for excess electricity charges apparently arose from IRS's use of office machinery not included in the solicitation. As noted above, the government concedes liability for such excess charges, although for an unspecified amount.[12] The March 8 letter made no other claim with respect to the government's deduction of utilities from its January and February rent payments.
 
 
 23
 There is no indication in the record that the government responded to Bedford's March 8 letter, and on March 20, 1979, Bedford served notice on GSA that it intended to terminate all services to the building, including electricity, at 6 P.M. on Friday, March 23, 1979, and to close the building "unless prior thereto the government agrees to, and pays, a reasonable and fair rent for its occupancy."C. The Proceedings Below
 
 
 24
 The government filed suit on March 22, seeking a temporary restraining order and preliminary injunction enjoining Bedford from closing and terminating services to the building. The complaint alleged that IRS occupied the premises and asserted that the government was therefore entitled, without more, to an injunction against denial of access and termination of services. The government's request for a temporary restraining order was heard by the district court on March 22, and the court ordered the government to amend its complaint to reflect the legal basis upon which it occupied the premises. The government added a second count to its complaint, alleging that it occupied the premises pursuant to a valid lease agreement and that defendants had breached certain terms of that agreement, and requesting specific performance of the breached terms.[13] At a hearing on the following day, the district court, with Bedford's consent, granted the temporary restraining order. Bowery was permitted to intervene, and the matter was set down for an evidentiary hearing.
 
 
 25
 In the meantime, according to Bowery, the mortgage on the premises had fallen into default by reason of Bedford's failure to pay real estate taxes and its failure to pay interest due and late charges to Bowery. On March 19, Bowery made a written demand on Bedford for an assignment of rents, based on the default, and notified GSA of its demand. On March 21, Bowery filed suit against Bedford and the government, seeking foreclosure of its mortgage on the 120 Church Street premises and an assignment of rents.[14]
 
 
 26
 The hearing on the government's motion for a preliminary injunction began on March 28 and continued through April 4. The district court heard testimony from employees of GSA, Bedford, and Bowery and received a large quantity of documentary evidence. Bowery supported the government's request for a preliminary injunction against Bedford, but urged that the granting of the motion be conditioned on the government's (1) payment of the rents to Bowery, and (2) payment of all utilities charges without deducting these amounts from the rent. The government resisted the requirement that it pay utilities charges, which it estimated would amount to $50,000 per month.
 
 
 27
 Judge Werker issued his findings of fact and conclusions of law from the bench at the close of the hearing on April 4, 1979. He found that the government would be irreparably injured in its tax collection functions if the building were closed and services terminated. He reached no conclusion, however, as to the likelihood that the government would ultimately prevail on the merits, noting that issues at trial would include whether or not the government had made a bona fide solicitation of offers, and whether its conduct in negotiations with Bedford, in brandishing the possible exercise of the second renewal option, had been unconscionable. The court concluded, however, that there were sufficiently serious questions going to the merits of the government's claims to make them fair ground for litigation, and that, focusing on IRS rather than on GSA, there was a tipping of the balance of hardships toward the government.[15] Having further found merit in Bowery's claims, Judge Werker concluded as follows:Now, on that basis I am granting a preliminary injunction to the plaintiffs here, on condition, however, that they will pay the utilities in connection with this building until this matter is resolved, that they will pay to the Bowery Savings Bank the rental which is due under the second option.
 
 
 28
 (A.567.) Accordingly, the preliminary injunction as filed on April 17, 1979, (1) enjoined Bedford from "terminating, interfering with, or in any other way disrupting the provision, supply, or furnishing of services" to 120 Church Street and from impeding the government's access to the building, (2) ordered that the government pay to Bowery all rents coming due after April 1, 1979 at the second renewal option rate ($185,516 per month), and (3) ordered that the government pay all utilities expenses, without setoff from its rental payments. The decretal paragraphs of the injunction are set out in full in the margin.[16]
 
 
 29
 On April 21, the government moved for modification of the preliminary injunction, to eliminate the requirement in paragraph 3 that the government pay utilities, on the ground that that requirement constituted a "mandatory injunction" against the United States and was, on principles of sovereign immunity, beyond the district court's jurisdiction. The district court denied the motion, stating that paragraph 3 was not an injunction against the government but only a condition on the granting of the injunction in favor of the government.
 
 
 30
 By motion dated June 1, 1979, the government also requested an order requiring Bedford to post an injunction bond of $150,000, to be increased by $50,000 each month, as security for the government's utilities payments. This motion too was denied.
 
 
 31
 The government appeals from paragraph 3 of the April 17, 1979 preliminary injunction requiring it to bear the costs of utilities, and from the district court's denials of its motions for modification of the preliminary injunction to eliminate paragraph 3 and for an injunction bond. Bowery has moved in this Court for dismissal of the government's appeal from paragraph 3 and Bedford has joined in the motion. Consideration of the motion for dismissal was postponed to the hearing on the merits.
 
 II
 
 32
 We turn first to the question of appellate jurisdiction. The principal issue is whether the government may appeal from the third paragraph of the April 17, 1979 preliminary injunction. The government argues that jurisdiction to entertain the appeal lies under 28 U.S.C. § 1292(a)(1) (1976),[17] either because paragraph 3 is a mandatory injunction against the United States, affirmatively requiring it to pay for utilities, or because it is a condition on the injunction granted to the United States. While we do not construe paragraph 3 as a mandatory injunction and we reject the notion that every condition on the granting of an injunction is appealable, we conclude that appeal is proper under § 1292(a)(1) because of the nature of paragraph 3 and because of its substantive relationship to the government's claim in this action.
 
 
 33
 By definition a mandatory injunction imposes an independent, affirmative obligation to take action. An order that merely imposes a condition on the granting of injunctive relief to a suitor, which the suitor may choose not to perform, cannot be considered a mandatory injunction against that suitor. Such a condition merely expresses the price the suitor must pay in order to obtain the benefit sought from his opponent, and the suitor can with impunity decide not to pay the price by simply electing to forego the benefit he had previously demanded.
 
 
 34
 In the circumstances of this action, we construe the district court's order as an injunction against Bedford which was conditioned on the government's payment of utilities, and not as an order that the government pay utilities irrespective of its demand that Bedford continue to operate the 120 Church Street building. Certainly neither Bedford nor Bowery sought an independent injunction; at the hearing both urged only that if the government's motion was to be granted, certain conditions should be attached. Although the form of the order as entered does not expressly state the conditional nature of paragraph 3, the order refers to the transcript of the April 4 hearing, at which Judge Werker stated explicitly that the payment of rent and utilities was to be a condition of his granting the government's motion. The conditional nature of paragraph 3 was reiterated by Judge Werker in the context of the government's challenge to the district court's jurisdiction to impose such a requirement as he denied the government's motion to delete that paragraph from the injunction:
 
 
 35
 The Court's April 17th order did not impose a "mandatory injunction" on the Government, but instead conditioned the granting of a preliminary injunction on the Government's payment of utility expenses.
 
 
 36
 (Order filed July 25, 1979.) While neither the language used nor the view of the ordering judge is necessarily controlling,[18] the circumstances of the present case compel us to conclude that the government has not been ordered to pay rent and utilities independently of its own insistence on having Bedford operate the building for the government's continued occupancy.
 
 
 37
 Having determined that paragraph 3 does not itself constitute an injunction against the government, but is rather a condition imposed on the granting of injunctive relief in its favor, we are left with the question whether the government may appeal from the condition. In arguing that it may so appeal, the government places primary reliance on two cases, Missouri-Kansas-Texas R.R. v. Brotherhood of Locomotive Eng'rs, 266 F.2d 335 (5th Cir. 1959), rev'd on the merits, 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1379 (1960) ("M-K-T" ), and United States v. Professional Air Traffic Controllers Org., 438 F.2d 79 (2d Cir. 1970), cert. denied, 402 U.S. 915, 91 S.Ct. 1373, 28 L.Ed.2d 661 (1971) ("PATCO"). Neither case is of great assistance. In M-K-T, the district court had entered an order which enjoined a strike by the union and, as a condition of that injunction, ordered the railroads either to suspend certain work rule changes or to pay the employees adversely affected by the changes. Both the union and the railroads appealed. Neither the court of appeals nor the Supreme Court discussed the question of jurisdiction over the appeal by the railroads. More importantly, the court of appeals had jurisdiction on a ground entirely different from that asserted here: the union's appeal was clearly proper under § 1292(a)(1), and the court of appeals therefore had jurisdiction over the entire order, Erving v. Virginia Squires Basketball Club, 468 F.2d 1064 (2d Cir. 1972), whether or not it would have had jurisdiction over the railroads' appeal if taken alone.
 
 
 38
 PATCO is little closer to the mark. In that case the government obtained a preliminary injunction against a work stoppage; one paragraph of the order required the government to restore returning workers to their previous positions and barred it from taking any disciplinary action against the employees involved.[19] As in M-K-T, both sides appealed; but in PATCO the employees' appeal was dismissed by stipulation while the case was sub judice. Thus, the PATCO Court had before it only the government's appeal from that paragraph of the preliminary injunction, otherwise granted in its favor, which required it to reinstate returning employees and which barred it from disciplining employees. The paragraph appealed from, however, cannot be deemed merely a condition on the granting of injunctive relief to the government, for whereas the employees were ordered to return to work immediately, the actions and forbearance required of the government were to continue "until further order of (the) court." Thus it would appear that the paragraph imposed independent obligations on the government of the sort that are routinely appealable under § 1292(a)(1). This Court held that it had jurisdiction without discussion.
 
 
 39
 As a general matter we have read § 1292(a)(1) as allowing the aggrieved party to appeal from injunctive orders which give, or aid in giving, substantive relief sought in the lawsuit, in order to preserve the status quo pending trial. See, e. g., International Prods. Corp. v. Koons, 325 F.2d 403, 406 (2d Cir. 1963).[20] See generally 9 Moore's Federal Practice P 110.20(1), at 232-33 (2d ed. 1975). We have held non-appealable under § 1292(a)(1) orders unrelated to the substantive issues of the litigation, that instead regulated such matters as procedures, disclosures, or conduct that was not the subject of the lawsuit.[21] See, e. g., International Prods. Corp. v. Koons, supra (order sealing depositions and prohibiting other disclosures); Weight Watchers of Philadelphia, Inc. v. Weight Watchers Int'l, Inc., 455 F.2d 770 (2d Cir. 1972) (order allowing defense counsel to communicate with members of the plaintiff class);[22] see also Miller v. United States, 403 F.2d 77, 78-79 (2d Cir. 1968) (order prohibiting defendant and his agents from interrogating jury). It is with these principles in mind that we hold that the government has the right to appeal in the present action. Our conclusion is based not on the simple fact that paragraph 3 is a condition on the injunction for not every condition would be appealable but on the substantive character of paragraph 3, on the nature of the order in which it appears, and on the relationship of paragraph 3 to the rest of the order.
 
 
 40
 It is clear that paragraph 3, equally with paragraphs 1 and 2 of the injunction, relates to the substantive relief sought in this lawsuit. As we discuss in greater detail in Part III infra, the government's action is one for specific performance of a lease agreement. The relief granted the government pendente lite in paragraph 1 of the injunction, enjoining Bedford from terminating services to or closing the building, is the ultimate relief sought by the government. Paragraphs 2 and 3, requiring the government to pay rent and utilities, respectively, are integrally related to the government's right to obtain the specific performance it seeks; paragraph 3 requires the government to pay an ongoing expense of the building, responsibility for which is one of the ultimate issues to be decided at trial. The fact that the requirements in paragraphs 2 and 3 were urged by Bedford and Bowery in derogation of the government's right to recover supports rather than detracts from their material and substantive character.
 
 
 41
 It is equally clear that paragraph 3 is part of a larger order which is of temporary duration and is designed to preserve the status quo. Each of the first three paragraphs is by its terms effective only "pending a trial on the merits and disposition thereof." Paragraph 1 is designed to keep the government in the building with services provided by Bedford; paragraph 4, which directs Bowery to use the rental payments first to pay the building's operating personnel, is also directed toward this end. Taking account of the testimony as to building operating costs, paragraphs 2 and 3 likewise must be deemed designed to require the government to make payments sufficient to keep the building open.
 
 
 42
 In short, paragraph 3 must be read as aiding the ultimate substantive relief sought by the government in the suit. We therefore deny the motions to dismiss the appeal,[23] and turn to the substantive issues.III
 
 
 43
 The principal question before us is whether the district court exceeded its jurisdiction in requiring the government to bear the cost of utilities. This is a difficult question because it lies at the intersection of two firmly established principles: (1) the principle that the government is liable to suit only to the extent that it has consented to be sued; and (2) the principle that it is the duty of a court in granting injunctive relief to fashion that relief in equitable terms. Because the requirements of paragraph 3 relate to conditions that are precedent to the government's establishing the merits of its claim in this action, we conclude that the district court had jurisdiction to impose those requirements as a condition of granting the government interim relief.[24]
 
 
 44
 It is clear that the United States as sovereign "is immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." United States v. Testan, 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976), quoting United States v. Sherwood, 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941). With regard to suits in the district courts, the government's consent has definite limitations. While any action for damages against the government on an express or implied contract may be brought in the Court of Claims, such a suit may be brought in a district court only if it seeks recovery of $10,000 or less. 28 U.S.C. §§ 1346, 1491 (1976). Counterclaims are subject to the same limitation. Apart from contract counterclaims for $10,000 or less, a defendant sued by the government in district court may have a setoff to the extent of the government's claim, but the principle of sovereign immunity deprives the court of jurisdiction to award a counterclaim against the government beyond the amount of the setoff. United States v. Shaw, 309 U.S. 495, 60 S.Ct. 659, 84 L.Ed. 888 (1940).
 
 
 45
 On the other hand, there is no question that the district court has broad discretion "to fashion such a preliminary injunction as may best approximate past positions in the light of the basic rights of the parties." Unicon Management Corp. v. Koppers Co., 366 F.2d 199, 204 (2d Cir. 1966). "The award of an interlocutory injunction by courts of equity has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff. . . ." Yakus v. United States, 321 U.S. 414, 440, 64 S.Ct. 660, 674, 88 L.Ed. 834 (1944). Thus, the Supreme Court in Brotherhood of Locomotive Eng'rs v. Missouri-Kansas-Texas R. R., 363 U.S. 528, 531-32, 80 S.Ct. 1326, 1329, 4 L.Ed.2d 1435 (1960), stated as follows:
 
 
 46
 If the District Court is free to exercise the typical powers of a court of equity, it has the power to impose conditions requiring maintenance of the status quo. Conditions of this nature traditionally may be made the price of relief when the injunctive powers of the court are invoked and the conditions are necessary to do justice between the parties. . . . "(I)t is the duty of a court of equity granting injunctive relief to do so upon conditions that will protect all . . . whose interests the injunction may affect." Inland Steel Co. v. United States, 306 U.S. 153, 157(, 59 S.Ct. 415, 417, 83 L.Ed. 557). Since the power to condition relief is essential to ensure that extraordinary equitable remedies will not become the engines of injustice, it would require the clearest legislative direction to justify the truncation of that power.
 
 
 47
 The question of subject matter jurisdiction in this case, i. e., of the power of the district court to condition the granting of the injunction on paragraph 3, therefore turns upon the extent to which the district court is free to exercise the typical powers of an equity court when the government is a suitor. The government takes the position that the court had no power to impose paragraph 3 because it in effect granted relief on Bedford's counterclaim. It asserts that since this counterclaim seeks more than $10,000 and is not supported by an independent jurisdictional basis and by a waiver of sovereign immunity, the district court was without power to entertain it.[25] The government argues that the district court has no power, under the guise of imposing a condition, to order relief that it is otherwise without jurisdiction to grant. We do not believe that Bedford's counterclaim is material to the question of the court's power, however, since we believe that the answer lies in the nature of the government's own claim.
 
 
 48
 In the present action the government seeks specific performance of the agreement to lease, which it contends was formed when GSA accepted Bedford's offer on October 30, 1978. In its arguments to this Court, the government has repeatedly glossed over its request for specific performance by describing Bedford's attempt to close the building and terminate services as simply a "threatened eviction" (see Gov't Br. on Appeal at 3, and passim ), and characterizing the relief sought as simply "an injunction barring defendants from locking the building." (Gov't Reply Br. at 21; see also Gov't Br. on Appeal at 26 n.*, stating that the government sued "solely for the limited purpose of preventing the defendants from carrying out their unlawful threats of self-help eviction.") Yet the plain fact is that the government asked the district court to compel Bedford affirmatively to provide all manner of services called for by the lease, including repair, maintenance, janitorial, and security services, to operate the building at 120 Church Street. The amended complaint unmistakably seeks specific performance of the claimed lease, and that pleading, like the original complaint and the contemporaneous preliminary injunction motion, explicitly seeks to require Bedford to continue rendering services to the building.[26] Indeed, the principal affidavit submitted in support of the government's motion emphasized the government's essential need for Bedford's services no fewer than five times in its span of five pages. Moreover, the government has never contested its obligation to pay rent,[27] which we take as a further indication that what it really seeks is specific enforcement of the lease obligation. Thus the government is not attempting merely to avert an eviction; its claim seeks significantly more than the simple possession of the building.[28]
 
 
 49
 It is axiomatic that in adjudicating the government's claim, as in adjudicating the claim of any other suitor, the court should deny relief if the claim lacks merit. (We reject categorically the surprising notion advanced by the government that the court does not have the power to deny its claim on the merits.)[29] As a matter of substantive law, a claim for specific performance of a contract may not be allowed if the claimant himself refuses to comply with his obligations under the contract. The Restatement of Contracts, for example, comments that "(a) decree for specific performance will not be granted in cases where the plaintiff has repudiated his duty without making timely retraction . . . or has otherwise already committed such a substantial breach as to discharge the duty of the defendant." § 375, comment a (1932). And to ensure that a decree of specific performance will not work an injustice on the defendant, the court may well make its decree conditional on certain actions by the claimant:
 
 
 50
 If specific performance is decreed in favor of a plaintiff who is himself in some default, complete justice requires that the defendant should not be compelled to perform without in the same proceeding compensating him for his injury. . . . Sometimes it may be necessary to require money payment by the plaintiff and to make the decree conditional on such payment.
 
 
 51
 Id., comment c.
 
 
 52
 Since the district court has the power ultimately to deny the government's claim for specific performance if the government refuses to perform its contractual obligations, thereby failing to establish its substantive right to recover, we conclude that it also has the power to deny the government's request for interim relief in the same vein unless, as a condition precedent, the government during the interim performs its contractual obligations. The question whether the district court correctly assessed, at this preliminary stage, the extent of those obligations is a question that goes to the propriety of the court's exercise of its discretion,[30] not to its power.
 
 
 53
 Given the nature of its claim in the present case, the government's reliance on Central Kentucky Natural Gas Co. v. Railroad Comm'n, 290 U.S. 264, 54 S.Ct. 154, 78 L.Ed. 307 (1933), is misplaced. In that case the Supreme Court reversed an order of the district court enjoining implementation of a confiscatory rate on condition that the plaintiff consent to the rate that the district court determined was just and reasonable. The plaintiff did not consent, and the district court therefore denied injunctive relief. The condition placed on the injunction, however, was not, as a matter of substantive law, a condition precedent to the company's claim: the company had a right to relief from the confiscatory rate, whether or not it was willing to submit to any other given rate. Indeed, so far from being an element of the claim to be adjudicated, the Supreme Court found that the determination of a reasonable rate was entirely within the prerogative of the state legislature, and the district court's order thus implicated serious concerns of federalism.
 
 
 54
 Our holding that when the government invokes the equity powers of the district court, that court has the power to withhold the relief requested unless the government performs the conditions precedent to its claim, finds support in decisions of our sister Circuits. See Martin v. United States, 240 F.2d 326 (4th Cir. 1957), on remand, 162 F.Supp. 932 (M.D.N.C.1958), aff'd in part, rev'd in part, 270 F.2d 65 (4th Cir. 1959); Jacobs v. United States, 239 F.2d 459 (4th Cir. 1956), cert. denied, 353 U.S. 904, 77 S.Ct. 666, 1 L.Ed.2d 666 (1957); Lacy v. United States, 216 F.2d 223 (5th Cir. 1954); cf. United States v. Wood, 466 F.2d 1385, 1389 (9th Cir. 1972) (semble ).
 
 
 55
 The closest of these cases is the Fourth Circuit's decision in Jacobs v. United States. In Jacobs, the government had terminated a defense contract in accordance with its terms and then sued the contractor, seeking specific performance of a surviving contractual provision which required the contractor to return certain government property that he had been using in performing the contract. The defendant counterclaimed for monies owed by the government under the contract. The district court ordered the contractor to return the property, on condition that the government pay him approximately $20,000 due on the counterclaim. The court of appeals affirmed, reasoning that
 
 
 56
 he who seeks equity must do equity, a principle binding upon the government, as well as upon individuals. . . . Certainly, one who asks specific performance of a contract should be required as a condition thereof to pay to his adversary the amount due him under the contract.
 
 239 F.2d at 461-62.[31]
 
 57
 The government attempts to distinguish Jacobs on two grounds: first, that in Jacobs the government was seeking to enforce its rights in personalty, whereas its rights at issue here relate to realty; and second, that Jacobs involved final rather than interim relief. In fact, however, the government here seeks services as well as an interest in realty. And we see no basis for concluding that the interim nature of the relief sought here diminishes the court's jurisdiction.
 
 
 58
 In Martin v. United States, supra, the government sought to enjoin the owners of property near a highway from trespassing on a strip of land between defendants' property and the highway itself. On the first appeal the court held that the government had not shown that it held a valid title to the strip of land in question. Remanding for further factfinding, the court directed that if the government were found to have a valid title, the injunction should issue.
 
 
 59
 If, however, no such showing is made, the granting of the injunctive relief to prevent access to a limited-access highway should be conditioned upon just compensation being made for the rights taken or upon proceedings being instituted for their condemnation.
 
 
 60
 240 F.2d at 330. On the second appeal, the court once again found (although on a different theory) that the government had not demonstrated the requisite interest in the strip of land, concluding:
 
 
 61
 We think no injunction should have been issued unless conditioned upon the prompt acquisition by purchase or condemnation of the defendants' rights of access, and that, in default of such acquisition, the complaint should be dismissed.
 
 
 62
 270 F.2d at 69.
 
 
 63
 In Lacy v. United States, supra, the United States brought suit for an injunction requiring defendant to remove certain wooden structures, which it considered fire hazards, from under transmission lines which the government had constructed and maintained across defendant's property. The district court granted the injunction. The Fifth Circuit reversed, holding that the government did not have a valid easement as against the defendant property owner, and that it therefore was entitled to an injunction only if it took affirmative steps to compensate him for the seizure. The court stated that "(t)he Government when applying for relief in a court of equity is as much bound to do equity as is a private litigant." 216 F.2d at 225. The government sought to rely on its power to seize property while leaving it to the owner to bring an inverse condemnation action, but the court of appeals noted that "(n)one of the cases goes so far as to hold that . . . (the government) may enjoin the property owner from the use of his own lands without itself offering to do equity." Id.[32] To the contrary, the court concluded,
 
 
 64
 (t)he Government . . . is still bound to do equity and, as a condition precedent to relief in this case, either to agree upon and pay to the property owner such compensation as it may owe him or, failing such agreement, to file the necessary proceedings for the ascertainment of such compensation.
 
 
 65
 Id. at 225-26.
 
 
 66
 The government's attempts to distinguish Lacy are unpersuasive. We are told that in Lacy, unlike the present case, the owner's use of his land was not inconsistent with the government's use, and that the owner therefore was not seeking to oust the government from the land.[33] United States v. Wood, supra, purported to find such a distinction, but the issue in Wood was the propriety of granting the government an unconditional injunction; the district court's power to condition the injunction was apparently assumed.[34] 466 F.2d at 1389.
 
 
 67
 The conditions placed on the injunctions in Lacy, Jacobs and Martin can be analyzed as conditions precedent to the government's claims in those cases. When viewed in these terms, it could be argued that Lacy and Martin are the more ambitious decisions. In both of those cases, the courts held, in effect, that payment of just compensation was a condition precedent to the government's right to injunctive relief in the district court against simple interference with its use and possession of land; such a holding arguably runs right to the verge of the government's sovereign immunity. Cf. United States v. Dow, supra; Hurley v. Kincaid, supra. But the same cannot be said of an action for specific performance of a contract calling for services, such as in Jacobs or such as we have here.
 
 
 68
 Our decision today does not permit the district courts to award defendants all manner of relief, in all sorts of cases, on their counterclaims against the government. Our ruling is simply that, on the facts before us, the district court had power to impose on the government the requirement that it perform pendente lite a condition precedent to its claim as a condition on the granting of its request for injunctive relief.[35] To hold otherwise in circumstances in which it appears that only the performance of the condition by the government will allow the balance of hardships to tip in its favor, would leave the district court but two choices, each unpalatable: either to deny the injunction even though the government has demonstrated irreparable injury and fair grounds for litigation, or to grant the government an injunction to which, as a matter of substantive law, it is not entitled. We decline to impose such a rigid regime in the name of sovereign immunity.
 
 IV
 
 69
 The final question before us is whether, in requiring the government to bear the cost of utilities, the district court abused its discretion or acted on an erroneous conclusion of law. Doran v. Salem Inn, Inc., 422 U.S. 922, 931-32, 95 S.Ct. 2561, 2567-68, 45 L.Ed.2d 648 (1975); Triebwasser & Katz v. American Tel. & Tel. Co., 535 F.2d 1356, 1358 (2d Cir. 1976). We have already concluded that the government's action is one for specific performance, and that the condition on the injunction granted in its favor merely requires the government to fulfill a prerequisite to its claim. It follows that, contrary to the government's argument, Bedford and Bowery did not have to show, in order to obtain the condition, that they would otherwise suffer irreparable harm. It also follows, however, that the amount of money that the government is required to pay in the interim must bear at least some rough relation to its obligations under the supposed lease agreement.
 
 
 70
 The district court did not address the latter question, and we are unable to find support in the record for a contractual obligation of the government to pay rent at the second renewal option rate plus all utilities.[36] We conclude that the district court erred when it used this measure in granting interim relief with a view to eventual specific performance.
 
 
 71
 As to rental, the government's liability does not appear to be limited to the second renewal option rate of $185,000 per month. Under Bedford's offer, as amended by its November 18, 1977 letter, the rent for the period between acceptance of the offer and completion of renovation was to be determined essentially on a per-floor basis. Bedford was to receive the new lease rate for renovated floors, and the second renewal option rate for unrenovated floors. Four floors of the building had been renovated during the first renewal term, pursuant to supplemental agreement number 24, and GSA was apparently willing to accept them as renovated for purposes of the new lease. Having deemed the November 18, 1977 letter part of Bedford's offer, the government could fairly clearly, on the present record, be charged with the obligation to pay for those four floors at the new lease rate.
 
 
 72
 As to utilities charges, it appears that Bedford was entitled to reimbursement for the cost of only so much electricity as was consumed by office machines that were not specified in the government's solicitation. The record shows that GSA did not accept any modification of Bedford's offer that required the government to pay all utilities. The government concedes, however, that it remains liable for the cost of electricity consumed by office machinery not specified in the solicitation.
 
 
 73
 On the basis of this record, we are unable to calculate precisely the amounts payable with respect to either the four renovated floors[37] or the excess electricity consumption.[38] Nevertheless, equity requires that the government not be allowed completely to avoid these responsibilities, and the amounts demanded by Bedford in its (unanswered) letter of March 8, 1979, appear to be reasonably related to the obligations of the government under the lease agreement it seeks to enforce. Accordingly, we conclude that the injunction should be modified (1) to provide that the rental payable by the government pending trial shall be at the second option renewal rate plus $12,278.64 per month on account of renovation completed to date, and (2) to delete the requirement that the government pay all utilities, substituting therefor the requirement that it pay Bowery $14,000 per month on account of excess electricity consumption. These modifications should operate prospectively only.
 
 
 74
 We remand so that the district court may reframe its injunction in accordance with this opinion, and in the light of any changes of circumstance that may have arisen in the interim.
 
 
 
 *
 Honorable John F. Dooling, Jr., Senior Judge of the U.S. District Court for the Eastern District of New York, sitting by designation
 
 
 [1]
 In all, the government filed three notices of appeal. On June 14 the government filed notice of appeal from the condition imposed by the April 17 injunction. Meanwhile, the government had moved the district court for modification of the April 17 injunction, and after denial of that motion on July 25, 1977, the government appealed from the denial of modification and again from the April 17 order by notice filed on August 22, 1979. In the interim, by notice of appeal filed July 18, 1979, the government had appealed from the district court's denial on June 11, 1979, of its motion for a bond. All of these appeals have been consolidated
 
 
 [2]
 Amcar Management Corp., which manages the building as agent for Bedford, was also named a defendant. For the sake of convenience, all of these entities will hereinafter be referred to collectively as "Bedford"
 
 
 [3]
 In fact, the renewal was executed on October 31, 1973, subject to Congressional approval, which was not forthcoming until December of that year. Under 40 U.S.C. § 606(a) (1976), the approval of the Committee on Public Works of each House of Congress is required prior to execution by the government of any lease for space at an average annual rental in excess of $500,000
 
 
 [4]
 The offer also provided for two five-year renewal options, at progressively higher annual rentals
 
 
 [5]
 The solicitation provided, at Schedule D, P 3, that if the premises were not ready for occupancy on November 1, 1978, the government could occupy such parts of the premises as it chose and pay rent on a pro rata basis. The November 18 letter thus modified the solicitation provision, because under the letter the government was obligated to continue occupying the entire building both the finished and the unfinished floors although it would pay a reduced rental on the unfinished floors
 
 
 [6]
 There was testimony, however, that as early as September 1977 Bedford suggested to GSA that Bedford make an offer that would be based on a requirement that the government pay for all utilities. Apparently GSA resisted this suggestion on the ground that other bidders would not have the opportunity to bid on the same basis
 
 
 [7]
 The GSA letter stated:
 We believe your new proposal needs additional detail and amplification for us to come to a conclusion. If your proposal can be justified as economically and otherwise in the best interest of the Government, it will be submitted to our Central Office for approval, after an award is made.
 (Joint Appendix ("A.") 832.) There was testimony at the hearing below that it is common practice for GSA to renegotiate various items with lessors, on a "quid pro quo" meaning a roughly equivalent, but not necessarily dollar-for-dollar exchange basis.
 
 
 [8]
 Bedford asserts that by early 1975 it was losing $1000 a day on the building. It estimated that if the government exercised the second renewal option its losses would be closer to $2000 a day in the first year alone. The government states that it has not been provided with enough data by Bedford to verify these figures. (Gov't Reply Br. at 14-15.)
 
 
 [9]
 The government apparently took the position, with which Bedford disagrees, that Bedford's agreement in 1973 to reduce the notice period to 30 days was not ad hoc with respect to the first renewal option then being considered but amended the lease with respect to the second renewal option as well
 
 
 [10]
 The solicitation provided that the unconditional acceptance of an offer received in response to the solicitation would establish a valid contract between the offeror and the government
 
 
 [11]
 The March 8 letter did not explain, and it remains unclear, how Bedford arrived at the figure $12,278.64. Bedford's brief places the increase in annual rental for the four floors at approximately $14,400 per month. (Bedford Br. on Appeal at 50 n. 38.) On the other hand, assuming equal space on all floors, Bedford's November 18 letter could be read as entitling Bedford to: 4/21 X ($241,847 - $185,516) = $10,729.71. Of course, if the amount of space on the floors varied and the November 18 formula was intended to turn upon the actual amount of space on the renovated floors, as a proportion of the total space in the building, the incremental increases would also vary. This might explain the figure in the March 8 letter
 
 
 [12]
 At the hearing below, the government estimated that total utilities charges were approximately $50,000 per month, and a Bedford employee estimated that in 1973 the government's excess consumption had represented approximately twenty per cent of the building's total utilities costs
 
 
 [13]
 On April 20, 1979, Bedford filed its answer to the government's complaint, denying the existence of an enforceable lease and counterclaiming against the government for the fair market rental value of the premises
 
 
 [14]
 The government moved in the district court for dismissal of Bowery's action for lack of subject matter jurisdiction. The motion is still apparently sub judice
 
 
 [15]
 The standard in the Second Circuit for injunctive relief clearly calls for a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief
 Jackson Dairy, Inc. v. H. P. Hood & Sons, 596 F.2d 70, 72 (2d Cir. 1979) (footnote omitted).
 
 
 [16]
 1. ORDERED, that pending a trial on the merits and disposition thereof, the defendants Bedford Associates, Doris K. Carver, Samuel Ades and Amcar Management Corp., their agents, representatives, employees, and servants be enjoined from terminating, interfering with, or in any other way disrupting the provision, supply, or furnishing of services, or in any way impeding, preventing, or in any other way denying access to the premises located at 120 Church Street, New York, New York;
 
 
 [2]
 ORDERED, that pending a trial on the merits and disposition thereof, the United States shall pay to The Bowery Savings Bank all rents as they are, or as they become, due and owing from and after April 1, 1979 under the provisions of the second renewal option of the lease executed September 28, 1962 between Doris K. Carver and Samuel Ades and the United States of America, as amended;
 
 
 [3]
 ORDERED, that pending a trial on the merits and disposition thereof, the United States shall pay all utilities expenses in connection with the operation of the premises located at 120 Church Street, New York, New York, and shall not be allowed to set off from the rent any of the aforesaid expenses paid or payable from and after April 1, 1979;
 
 
 [4]
 ORDERED, that all rentals paid to The Bowery Savings Bank by the United States as aforesaid shall be applied by The Bowery Savings Bank first, to such payments to building personnel of the premises at 120 Church Street, New York, New York as may be necessary to maintain the usual day-to-day operation of said premises; second, to such payments of current taxes as may be necessary to prevent interference with said operation of said premises; third, to the release and payment of real estate tax and water and sewer rental liens now existing against said premises; and fourth, to all other amounts due to The Bowery Savings Bank under its first mortgage on said premises
 (Order filed April 17, 1979.)
 
 
 [17]
 Section 1292(a)(1) provides, in relevant part:
 (a) The courts of appeals shall have jurisdiction of appeals from:
 (1) Interlocutory orders of the district courts of the United States . . . granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions . . . .
 
 
 [18]
 See, e. g., Diversified Mortgage Investors v. U.S. Life Title Ins. Co., 544 F.2d 571 (2d Cir. 1976), in which an order construed as a preliminary injunction by the district court was considered in effect a permanent injunction by the majority (id. at 575-77), while the dissenter felt it was not an injunction at all (id. at 577-78)
 
 
 [19]
 The paragraph in question provided:
 That the Federal Aviation Administration be and it hereby is directed until further order of this court:
 (a) To restore all defendants in the action who have returned to work to the performance of the duties to which they were assigned prior to March 25, 1970, not later than May 18, 1970.
 (b) To withhold any further administrative actions in respect of suspensions, removals or any other sanctions based upon the alleged work stoppage between March 25, 1970 and April 14, 1970, against any employees who are defendants in these actions and subject to the temporary injunction issued by this court.
 438 F.2d at 80.
 
 
 [20]
 In International Prods. Corp. v. Koons, supra, we stated as follows:
 We think it better, in line with our prior decisions, to continue to read § 1292(a)(1) as relating to injunctions which give or aid in giving some or all of the substantive relief sought in a complaint . . . .
 325 F.2d at 406. Bowery argues that the government therefore may not appeal from paragraph 3 because the relief granted in that paragraph was not sought by the United States. The key word in the quoted sentence, however, is "substantive," not "complaint." The discovery order at issue in Koons was held non-appealable because of its non-substantive nature. Id. And in previous cases this Court has not thought it necessary, for an order to constitute an injunction, that the relief it grants actually be requested in a complaint. See, e. g., PATCO, supra, in which the employees' organization had not filed any counterclaim asking that the government be enjoined from taking disciplinary measures.
 
 
 [21]
 None of the cases relied on by Bowery and Bedford for the proposition that the condition imposed by paragraph 3 is nonappealable involved orders granting temporary substantive relief to preserve the status quo
 
 
 [22]
 To the same general effect are Taylor v. Board of Educ., 288 F.2d 600 (2d Cir. 1961) (dismissing appeal from order that defendants submit a desegregation plan to district court), and Waylyn Corp. v. Casalduc, 219 F.2d 888, 890 (1st Cir. 1955) (holding non-appealable "a mere administrative turn-over direction (requiring the mortgagor to turn over certain deposits), in the course of a receivership"). See also Rodgers v. United States Steel Corp., 541 F.2d 365, 373 (3d Cir. 1976); Ronson Corp. v. Liquifin Aktiengesellschaft, 508 F.2d 399, 401 (2d Cir. 1974); Siebert v. Great N. Dev. Co., 494 F.2d 510, 511 (5th Cir. 1974)
 
 
 [23]
 The district court's order denying the government's motion to require Bedford to post a bond was not an appealable order under § 1292(a)(1) since it did not deny an injunction. Nor was it appealable under 28 U.S.C. § 1291 (1976), since it was not a "final decision" within the meaning of Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546-47, 69 S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949), there being no question here that the district court had the power to deny a bond, see International Controls Corp. v. Vesco, 490 F.2d 1334, 1356 (2d Cir. 1974), cert. denied, 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1975), but only the question whether or not it abused its discretion. See Bancroft Nav. Co. v. Chadade S. S. Co., 349 F.2d 527, 529-30 (2d Cir. 1965). Of course, since we have jurisdiction over the government's appeal from the order requiring it to pay utilities, we have the power to review this related, but otherwise nonappealable, order denying the bond. Cf. Deckert v. Independence Shares Corp., 311 U.S. 282, 287, 61 S.Ct. 229, 232, 85 L.Ed. 189 (1940); Erving v. Virginia Squires Basketball Club, supra
 In any event we find no error in the district court's refusal to require Bedford to post an injunction bond, even if Bedford were to be considered an "applicant" for purposes of Fed.R.Civ.P. 65(c). The parties in this case have an ongoing relationship, and if the government prevails it will be able to recoup any excess payments out of future rent due. The district court did not abuse its discretion in denying the government's motion for an injunction bond. See Clarkson Co. v. Shaheen, 544 F.2d 624, 632 (2d Cir. 1976); International Controls Corp. v. Vesco, supra.
 
 
 [24]
 We therefore do not reach Bowery's argument that the district court had jurisdiction to order the government to pay utilities as interim relief under 28 U.S.C. §§ 1346(f), 2409a (1976)
 
 
 [25]
 Bedford has taken the position that at least part of its counterclaim sounds in tort rather than in contract, and is therefore, regardless of amount, properly brought in the district court under 28 U.S.C. § 1346 (1976)
 
 
 [26]
 Paragraphs 10 and 11 of both the original complaint and the amended complaint read as follows:
 
 
 [10]
 Notwithstanding the fact that the United States, upon receipt of the letter, immediately informed Amcar of the unlawfulness of its intended termination of services and closing of the premises and of the severe and irreparable harm which would result therefrom, and despite the fact that the United States directed Amcar as agent for (Bedford) to disavow its intended conduct, Amcar has failed and refused to do so and has reiterated its intention to terminate services and deny access to the premises on March 23, 1979 at 6:00 P.M
 
 
 [11]
 Unless defendants are immediately enjoined from terminating services to and closing the premises, the United States and the public will suffer severe and irreparable harm
 
 
 [27]
 We note also that the government does not concede that the court has the power to compel it to pay such rents
 
 
 [28]
 If the government were simply seeking possession of the building, it could of course achieve this by relying on its power of eminent domain. It could file a condemnation petition and a declaration of taking (the interest taken may be less than a fee simple absolute), and deposit the amount it estimates to be "just compensation" with the court, thereby entitling it to a court order granting it immediate possession. See 40 U.S.C. § 258a (1976); see generally 6A Nichols on Eminent Domain § 27.25 (rev. 3d ed. 1976). Or it could physically seize the building, leaving the owner to seek just compensation in what has come to be known as an "inverse condemnation" proceeding. 28 U.S.C. §§ 1346(a)(2) and 1491 (1976). See United States v. Dow, 357 U.S. 17, 21, 78 S.Ct. 1039, 1044, 2 L.Ed.2d 1109 (1958); Hurley v. Kincaid, 285 U.S. 95, 104, 52 S.Ct. 267, 269, 76 L.Ed. 637 (1932)
 The government disavows use of its eminent domain power with respect to the 120 Church Street building. Perhaps the lease it seeks to enforce provides it with a greater economic benefit than it would derive from a taking, which would require it to pay just compensation. If true, this would not diminish the government's right to the benefit of its bargain, but it would hardly argue for giving the government the windfall of having the fully serviced premises without fulfilling its own part of the bargain.
 
 
 [29]
 The government's Brief on Appeal, at 14 n.*, states:
 Judge Werker has apparently taken the position that he has jurisdiction to order, after a trial on the merits, that the United States is not entitled to an injunction . . . . (T)he District Court is without jurisdiction to rule on these questions.
 
 
 [30]
 See Part IV infra
 
 
 [31]
 Jacobs went on to quote a portion of the opinion in Lacy v. United States, supra, which quoted United States v. The Thekla, 266 U.S. 328, 339-40, 45 S.Ct. 112, 113, 69 L.Ed. 313 (1924), to the effect that when the United States brings suit, "it so far takes the position of a private suitor as to agree by implication that justice may be done with regard to the subject matter." The Thekla, however, is not on point because it involved claims for collision in admiralty; the "subject matter" in such a case is the collision itself, and "(l)ibels and cross-libels for collision are one litigation and give rise to one liability." United States v. Shaw, supra, 309 U.S. at 502-03, 60 S.Ct. at 662. Claims and counterclaims at law and in equity are separate "subject matters," in this sense, as the Supreme Court in Shaw pointed out in distinguishing The Thekla. Id
 
 
 [32]
 The court noted, and apparently gave some weight to the fact that the defendant's claim for compensation may have been time-barred. 216 F.2d at 225. But the question whether the claim was barred, while relevant to the merits of the government's request for injunctive relief, clearly has no jurisdictional significance. Thus, Lacy cannot be distinguished from the present case on this ground
 
 
 [33]
 The district court's opinion in Lacy contradicts this assertion. That court found that there was no dispute that the owner's use gave rise to a fire hazard which threatened the transmission lines. 116 F.Supp. 15, 18 (N.D.Ala.1953). Indeed, one may well wonder why the government would have brought suit if the uses were not inconsistent
 
 
 [34]
 United States v. Patterson, 206 F.2d 345 (5th Cir. 1953), and the other cases cited to us by the government at pages 26-27 of its brief, are simply inapposite, since none of them involved a condition on an injunction granted to the government. In Patterson, for example, the district court had denied the government injunctive relief, and it had entered an injunction against the government on the defendant's counterclaim, which was obviously barred under United States v. Shaw, supra
 
 
 [35]
 Nor does our holding encourage landlords to employ self-help measures against the government. If the government is meeting all of its obligations to those landlords i.e., fulfilling all of the conditions precedent to its claim for relief it will be entitled to an unconditional injunction and the landlord will have gained nothing by the exercise
 
 
 [36]
 We note that Bedford's March 2, 1978 letter proposed a scheme of rent payments which more closely resembles the structure of what the district court ordered: first renewal option rent ($176,000 per month) plus utilities. It appears that the district court did not in fact rely on the March 2 letter, since it referred to the second, not the first, renewal option. Nor would it have been appropriate to base the injunction on the March 2 proposal, since it appears on this record that Bedford acquiesced in the government's exclusion of the March 2 letter from Bedford's offer
 
 
 [37]
 See note 11 supra
 
 
 [38]
 See note 12 supra