**Julius W. ERVING, Plaintiff-Appellant,**

v.

**The VIRGINIA SQUIRES BASKETBALL CLUB, a Limited Partnership, Defendant-Appellee.**

No. 368, Docket 72–2089.

United States Court of Appeals, Second Circuit.

Argued Oct. 12, 1972.

Decided Oct. 24, 1972.

Neil A. Pollio, New York City (Phillips, Nizer, Benjamin, Krim & Ballon, New York City, on the brief), for plaintiff-appellant.

Clark J. Gurney, New York City (Fred J. Halsey, Jr., New York City, Charles E. Matthews, Jr., White Plains, N. Y., and Roth, Carlson, Kwit, Spengler & Goodell, New York City, on the brief), for defendant-appellee.

Before FRIENDLY, Chief Judge, and MEDINA and ANDERSON, Circuit Judges.

MEDINA, Circuit Judge:

This case presents another chapter in the history of contract jumping by famous American athletes. As usual the amounts paid by the competing teams are fantastic. Julius W. Erving, we are told, was playing a remarkable game of

basketball as an undergraduate at University of Massachusetts when, after his junior year, he agreed to turn professional and he signed a contract with the Virginia Squires to play exclusively for the Squires for four years commencing October 1, 1971 for $500,000.00. He made an extraordinary record in his first year as a pro, but he seems, for one reason or another, to have defected and in April, 1972 he signed a contract to play for the Atlanta Hawks. This contract with the Hawks is not before us but we were informed on the oral argument that it called for payments to Erving, or "Dr. J." as he was generally called by the fans, aggregating $1,500,-000.00 or more.

What is before us is an appeal from an injunction order, in support of a counterclaim asserted by the Squires in an action by Erving to set aside his contract with the Squires for fraud. The counterclaim seeks an injunction enjoining Erving from playing basketball with any team other than the Squires, pending the determination of the dispute between the parties by arbitration pursuant to the terms of the contract between Erving and the Squires [1] and the provisions of the federal Arbitration Act, 9 U.S.C., Sections 1, et seq. Judge

Neaher gave the case extensive consideration below, not only in granting the application of the Squires for arbitration and for a supporting injunction, 349 F. Supp. 716 but also in deciding a prior motion 349 F.Supp. 709 attacking the jurisdiction of the District Court for the Eastern District of New York and in the alternative for the transfer of the case to a federal court in Virginia. The opinion below is not yet reported.

In view of the large sums of money involved, and the publicity generated by the reputation of "Dr. J." as a highly talented basketball player with a brilliant future, we need not be surprised at the amount of perhaps pardonable exaggeration and bombast in the claims of the respective parties. On the one hand we are assured that "Dr. J.," was, as stated in the opinion below, "for all practical purposes" the Squires' "whole team," that he was featured in the Squires' advertisements as "fabulous" and that the fans were deserting in droves when told that "Dr. J." had switched to the Hawks. On the other hand we are told that there is no showing of irreparable harm to the Squires if "Dr. J." plays with the Hawks, and the charge of fraud in inducing this innocent collegian to leave college and play

1. "13. Arbitration. In the event of any dispute arising between the PLAYER and the CLUB relating to any matter or thing whatever, whether or not arising under this Contract, or concerning the performance or interpretation thereof, such dispute shall be determined by arbitration before the Commissioner of the American Basketball Association, or a person designated by such Commissioner in writing for such purpose, acting as Arbitrator. The Arbitrator shall determine by whom and in what proportion the cost of arbitration shall be paid. The PLAYER and the CLUB hereby grant such Arbitrator full power to determine such dispute in such manner as he shall direct, and under such rules of procedure as he shall in his sole discretion adopt, and his decision shall be final, binding and conclusive and may be enforced in any court, state or Federal, having competent jurisdiction. Demand for arbitration hereunder shall be made

by notice in writing given to the other party and to the Commissioner of the ASSOCIATION. Notwithstanding the foregoing, the CLUB shall have the right in its sole discretion to institute judicial proceedings for the purpose of obtaining an injunction or other equitable relief pursuant to paragraph 5 hereof."

  \*       \*       \*       \*       \*

"5. Injunctive Relief. The PLAYER hereby represents that he has special, exceptional and unique knowledge, skill and ability as a basketball player, the loss of which cannot be estimated with any certainty and cannot be fairly or adequately compensated by damages and therefore agrees that the CLUB shall have the right, in addition to any other rights that the CLUB may possess, to enjoin him by appropriate injunction proceedings against playing basketball for any person, firm, corporation or institution, or injunction against any other breach of this contract."

for the Squires for four years for the inadequate sum of $500,000.00 is repeated *ad nauseam*.

■ We think, however, that irreparable damage to the Squires is plainly proved even if we assume that "Dr. J." is not the Squires' "whole team" and even if we doubt, as we do, that in the absence of "Dr. J." the Squires will collapse and with them the whole American Basketball Association.

■ Just as counsel for "Dr. J." repeat in various colorful phrases the claim that "Dr. J." was defrauded, counsel for the Squires insist that this is just a plain, ordinary case of contract jumping to get more money, that the claim of fraud did not originate until two months or more after "Dr. J." had signed his contract with the Hawks, and that the whole sorry business is nothing more nor less than the usual maneuvering by a greedy young athlete to sell out to the highest bidder. We do not pass upon these conflicting claims as they are the very issues to be determined by the arbitration of the dispute.

After appellant's application to Judge Feinberg for a stay of the order appealed from was denied, the hearing of the appeal was expedited and we heard oral argument on Thursday, October 12. We are filing this opinion at the earliest possible moment consistent with a proper consideration of the numerous points raised by counsel for Erving.

■ . We find the order clearly appealable without reaching many of appellee's contentions to the contrary. The appeal is from an order granting an injunction, 28 U.S.C., Section 1292(a)(1), and it is well settled that such an appeal brings before us the entire order and not merely the propriety of the granting of the injunctive relief. Wright, Federal Courts, 459 (2d Ed. 1970); Smith v.

Vulcan Iron Works, 165 U.S. 518, 17 S. Ct. 407, 41 L.Ed. 810 (1897); see also Deckert v. Independence Shares Corp., 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1940).

As to the other law points we have little to add to Judge Neaher's excellent opinion.

■■ We find no lack of mutuality in the arbitration clause of the contract. Both parties are required to arbitrate any disputes arising between them. The provision relative to "obtaining an injunction or other equitable relief" is merely declaratory of existing legal rights. Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970); Albatross S.S. Co. v. Manning Bros., 95 F.Supp. 459 (S.D.N.Y.1951).

■ The arbitration clause is as broad as can be imagined and, if federal law governs as we later hold, the fraud issues are for the arbitrator to decide. Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967); Robert Lawrence Co. v. Devonshire Fabrics, Inc., 271 F.2d 402 (2d Cir. 1959), cert. granted, 362 U.S. 909, 80 S.Ct. 682, 4 L.Ed.2d 618, dismissed, 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1960). And, in a proper case such as we have here, the only way to preserve the *status quo* during the pendency of the arbitration proceeding is by the granting of injunctive relief. See Boys Markets, Inc. v. Retail Clerks Union, Local 770, *supra*; Albatross S.S. Co. v. Manning Bros., *supra*.

■ The claim that Judge Neaher had no power to direct the substitution of a neutral arbitrator for the disqualified Commissioner of the American Basketball Association is typical of other attempts to emasculate arbitration procedures under the federal act.[2] We must

---

2. Judge Neaher held the view that a neutral arbitrator should be substituted for the Commissioner of the American Basketball Association in spite of the con-

tract clause naming the Commissioner as arbitrator. Such a substitution was necessitated, according to Judge Neaher, because the Commissioner of the Ameri-

bear in mind that here, as we later hold, we are applying federal law (Robert Lawrence Co. v. Devonshire Fabrics, Inc., *supra*), and that the federal law is to be implemented in such a way as to make the arbitration effective and not to erect technical and unsubstantial barriers such as were the mode in the early days when arbitration was viewed by many courts with suspicion and hostility.

■ Erving claims that the Squires have waived their right to arbitration. This claim has no merit whatever and we reject it. After continuing to play for the Squires and accepting payments from them pursuant to the terms of his contract with them through May, 1972, Erving on June 9, 1972 commenced this action in the District Court for the Eastern District of New York for rescission of the contract because of alleged fraud and for damages. After Judge Neaher denied the motion of the Squires attacking the jurisdiction of the Court over the person of the defendant and in the alternative for the transfer of the action to the Eastern District of Virginia, Norfolk Division, an answer was filed in which the Squires alleged a counterclaim against Erving and, as a defense, the arbitration clause of the contract. Consistent with the claim of the Squires that the proper judicial tribunal to pass upon issues arising out of the dispute between the parties was not the District Court for the Eastern District of New York but rather the District Court for the Eastern District of Virginia, Norfolk Division, the Squires, on September 13, 1972, commenced an action in the Virginia federal court asserting its right to arbitration and for injunctive relief. How this could be deemed a waiver of the right to arbitration is far from clear. Indeed, it is just the opposite. While Judge Neaher was deliberating on the motion for dismissal for lack of jurisdiction of the person or for the transfer of the case to Virginia, the Virginia case was held in abeyance, evidently by agreement of the parties. With the jurisdiction and transfer issues disposed of on September 19, 1972, the answer of the Squires containing the counterclaim and the assertion of their right to arbitration was filed on September 21, 1972. The Squires' motion for injunctive relief was heard on October 2, 1972 and resulted in the order appealed from sustaining the Squires' right to arbitration and enjoining Erving during the pendency of the arbitration proceeding from playing basketball for any club other than the Squires. How this sequence of events could possibly be construed as a waiver by the Squires of their right to arbitration is beyond our comprehension. We hold that there was no waiver. Erving's reliance on our decision in Demsey & Associates v. S.S. Sea Star, 461 F.2d 1009 (2d Cir. 1972), is misplaced. Properly construed the case clearly supports the conclusion that here there not only was no prejudice to Erving but that in this case there was no delay whatever on the part of the Squires in asserting its right to arbitration.

■ Appellant vigorously argues that the Federal Arbitration Act, 9 U.S. C., Section 1, et seq., is not applicable to this case. Erving asserts that the disputed contract is not "a contract evidencing a transaction involving commerce" within the meaning of 9 U.S.C., Section 2. The term "commerce" is defined in 9 U.S.C., Section 1 to "mean(s) commerce among the several States."

Appellant finds comfort in support of this contention from the decision of this

---

can Basketball Association, Robert S. Carlson, Esq., is listed as a partner of the law firm representing the Squires. The complaint alleges that Erving's agent in the contract negotiations "acted on behalf and in the interest of the defendant and the American Basketball Association * * *." This ruling in favor of a neutral arbitrator was, of course, designed to insure a fair and impartial hearing.

Court in Conley v. San Carlo Opera Co., 163 F.2d 310 (2d Cir. 1947), aff'g 72 F. Supp. 825 (S.D.N.Y.1946). There this Court did affirm a District Court decision holding that a contract whereby a singer gave an opera company an option on his services as an operatic tenor did not evidence a transaction arising out of "interstate commerce" within the federal Arbitration Act even though the singer would travel through various states in giving performances. The District Court, however, relied heavily on the Supreme Court's decision in Federal Base Ball Club v. National League, 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898 (1922), in holding that contracts for the personal services of entertainers were matters of state law not the subject of interstate commerce. The Supreme Court made clear as long ago as United States v. Shubert, 348 U.S. 222, 75 S.Ct. 277, 99 L.Ed. 279 (1955), and United States v. International Boxing Club, 348 U.S. 236, 75 S.Ct. 259, 99 L.Ed. 290 (1955), that Federal Base Ball did not apply to any form of interstate exhibition other than baseball. Two years later, Radovich v. National Football League, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957), held that a contract between a professional football player and his club was a subject of interstate commerce within the antitrust laws. At the last term the Court observed that Federal Base Ball and its successor, Toolson v. New York Yankees, Inc., 346 U.S. 356, 74 S.Ct. 78, 98 L.Ed. 64 (1953), "have become an aberration confined to baseball," Flood v. Kuhn, 407 U.S. 258, 282, 92 S.Ct. 2099, 2112, 32 L.Ed.2d 728 (1972). San Carlo Opera Co. cannot properly be given a wider application than the underpinning on which it rested. Besides, its holding that a contract of personal service with a business engaged in interstate commerce is not within the Arbitration Act appears to be inconsistent with Prima Paint, supra, 388 U.S. at 401 and footnote 7, 87 S.Ct. 1801.

■ In addition appellant suggests that his case comes within the exclusionary language of 9 U.S.C., Section 1 that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." In light of this Court's decision in Signal-Stat Corp. v. Local 475, United Electrical Radio & Machine Workers, 235 F.2d 298 (1956), cert. den. 354 U.S. 911, 77 S.Ct. 1293, 1 L.Ed.2d 1428, reh'g den. 355 U.S. 852, 78 S.Ct. 7, 2 L.Ed.2d 61 (1957), this argument must fail. There this Court held that the exclusionary clause in Section 1 applied only to those actually in the transportation industry. Erving clearly is not involved in the transportation industry.

The decision in Signal-Stat, supra, was recently followed in Dickstein v. duPont, 443 F.2d 783 (1st Cir. 1971) where the court observed that other courts generally limit the exception in 9 U.S.C., Section 1 to employees involved in, or closely related to the actual movement of goods in interstate commerce. Our interpretation of the exception clause followed that of the Third Circuit in Tenney Engineering Inc. v. United Electrical Radio & Machine Workers, Local 437, 207 F.2d 450 (1953).

In light of the strong national policy in favor of arbitration as a means of settling private disputes we see no reason to give an expansive interpretation to the exclusionary language of Section 1 by reexamining our decision in Signal-Stat, supra.

Affirmed.