MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., Plaintiff,

v.

Francis R. DeCARO, Defendant.

No. 83–1241–CV–W–9–3.

United States District Court,
W.D. of Missouri, W.D.

Dec. 21, 1983.

Gordon D. Gee, Gregory L. Vranicar, Kansas City, Mo., for plaintiff.

John W. Shaw, Kansas City, Mo., for defendant.

## OPINION AND ORDER

ELMO B. HUNTER, District Judge.

Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch), initiated this action on November 15, 1983. The complaint set out facts alleging that Francis R. DeCaro, (DeCaro), had violated certain terms of an "Account Executive Trainee Agreement" that the two had entered upon DeCaro's employment with Merrill Lynch. In conjunction with the complaint, Merrill Lynch moved for an order to direct DeCaro to show cause why a preliminary injunction should not be entered against him because of his continuing violations of the agreement. On November 18, 1983, DeCaro commenced arbitration proceedings in front of the New York Stock Exchange, (NYSE), in regard to the same issues raised by the complaint. On November 25, 1983, DeCaro responded to the motion seeking a show cause order by moving the Court to order the parties to arbitrate their disputes and to stay the action pending the arbitration, pursuant to the United States Arbitration Act, 9 U.S.C. § 3. Both parties have extensively briefed the issues: (1) whether arbitration is proper in this instance and (2) if arbitration is appropriate, whether the Court should stay the action or proceed to rule on the request for a preliminary injunction. For the reasons enunciated below, the Court finds that the allegations of

the breach of the trainee agreement are properly arbitrable and that the action should be stayed pending completion of the arbitration.

The following "facts" are adduced from the pleadings and the briefs. Merrill Lynch hired DeCaro as an account executive trainee in January of 1977, and promoted him to account executive in May of 1977. In consideration for his employment, Merrill Lynch required DeCaro to sign an "Account Executive Trainee Agreement" when it hired him. In paragraph one DeCaro agreed that the names and addresses of the clients of Merrill Lynch were the property of Merrill Lynch and that during and after his employment with Merrill Lynch he would not communicate client information nor take from Merrill Lynch offices client records or duplicates thereof.[1] In paragraph two DeCaro agreed not to solicit Merrill Lynch clients for a year if he left the employ of Merrill Lynch.[2] Finally, in paragraph five DeCaro agreed that any controversy with Merrill Lynch arising out of his employment or the termination of his employment would be settled by arbitration under the auspices of the NYSE, if requested by either party.[3] Also, upon beginning his employment with Merrill Lynch, DeCaro was required to register with the NYSE and sign NYSE Form U–4.[4] Form U–4 states in part that any controversy between the registered representative DeCaro, and a member organization of the NYSE that arises out of the employment or termination of employment of the former shall be arbitrated under NYSE rules if requested by either party.[5]

On November 4, 1983, DeCaro resigned from Merrill Lynch and took a similar job with Shearson/American Express, Inc., (Shearson). Merrill Lynch claims that prior to his leaving their offices DeCaro obtained and removed certain clients' records in violation of the trainee agreement and that he is now soliciting Merrill Lynch clients that he served or became aware of while at Merrill Lynch also in violation of the trainee agreement. The present suit is based on these alleged violations of the trainee agreement.

### ARBITRATION

DeCaro maintains that the violations alleged by Merrill Lynch are within the scope of the arbitration clause of the trainee

---

1. Paragraph one states in full:
   All records of Merrill Lynch, including the names and addresses of its clients, are and shall remain the property of Merrill Lynch at all times during my employment with Merrill Lynch and after termination for any reason of my employment with Merrill Lynch, and that none of such records nor any part of them is to be removed from the premises of Merrill Lynch either in original form or in duplicated or copied form, and that the names, addresses, and other facts in such records are not to be transmitted verbally except in the ordinary course of conducting business for Merrill Lynch.

2. Paragraph two states in full:
   In the event of termination of my services with Merrill Lynch for any reason, I will not solicit any of the clients of Merrill Lynch whom I served or whose names became known to me while in the employ of Merrill Lynch in any community or city served by the office of Merrill Lynch, or any subsidiary thereof, at which I was employed at any time for a period of one year from the date of termination of my employment. In the event that any of the provisions contained in this paragraph and/or paragraph (1) above are violated I understand that I will be liable to Merrill Lynch for any damage caused thereby.

3. Paragraph five states in full:
   I agree that any controversy between myself and Merrill Lynch arising out of my employment, or the termination of my employment, with Merrill Lynch for any reason whatsoever shall be settled by arbitration at the request of either party in accordance with the Constitution and Rules of the New York Stock Exchange, then in effect.

4. Rule 345.11 of the NYSE requires anyone wishing to register as a representative with the Exchange to apply for registration on Form U–4.

5. Form U–4(j) provides:
   I agree that any controversy between me and any member or member organization or affiliate or subsidiary thereof arising out of my employment or the termination of my employment shall be settled by arbitration at the instance of any such party in accordance with the arbitration procedure prescribed in the Constitution and the Rules then obtaining of the New York Stock Exchange, Inc.

agreement and NYSE Form U–4,[6] and, therefore, are arbitrable at the request of either party. Merrill Lynch counters that New York law is controlling and that under New York law these violations which arose after DeCaro's voluntary termination of his employment are not within the arbitration provisions of the agreement nor the rules of the NYSE.

In determining the scope of the arbitration clauses and provisions involved in this action the Court is not bound by New York law as suggested by Merrill Lynch.[7] Whenever the United States Arbitration Act is applicable federal law determines whether the dispute is arbitrable. Section two of the Act, in effect, creates "a body of federal law" which applies to any arbitration agreement under the Act. *Moses H. Cone Memorial Hospital v. Mercury Construction Co.,* — U.S. —, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). Section two also describes the requirements for an arbitration provision to fall within the Act. Pertinent to this action, the arbitration provision must be in writing and contained in a "contract evidencing a transaction involving commerce" 9 U.S.C. § 2. The trainee agreement between Merrill Lynch and DeCaro, which contains the arbitration clause, satisfies the commerce requirement of section two. *See Merrill Lynch, Pierce, Fenner & Smith, Inc., v. Shubert,* 577 F.Supp. 406 (M.D.Fla. 1983); *Merrill Lynch v. Thomson,* 574 F.Supp. 1472, 1475 (E.D.Mo.1983); *Shearson, Hayden Stone, Inc., v. Liang,* 493 F.Supp. 104, 106 (N.D.Ill.1980). The scope of the arbitration clause within the trainee agreement is, therefore, governed by federal law.

The parties cite divergent cases from district courts within this circuit in support of their respective positions on the scope of the arbitration clause in question. Merrill Lynch takes an almost purely temporal view of the scope of the arbitration clause. It maintains that the clause only covers disputes that arise during the term of employment or at the time of termination. In support of its position Merrill Lynch relies on *Wichmann v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* A3–83–115 (D.N.Da. Sept. 9, 1983). Wichmann a former account executive with Merrill Lynch and subject to identical non-competition, non-solicitation clauses, as DeCaro is subject to here, resigned from Merrill Lynch to work for another broker. Wichmann brought

**6.** Besides the arbitration clause contained in the trainee agreement and the statement in the U–4 Form, set out in footnotes three and five, DeCaro as a representative and Merrill Lynch as a member also come under the arbitration provision of NYSE Rule 347. Rule 347 mirrors the language contained in Form U–4 in all significant respects. The parties may also be covered by Article VIII of the NYSE Constitution, which calls for arbitration of disputes between members and nonmembers of the NYSE arising out of the business of the member. Since for the purposes of the present action the arbitration clause in the trainee agreement is sufficient the Court will not venture an opinion on the applicability of Article VIII.

**7.** Merrill Lynch asserts that New York law applies because the parties agreed in the trainee agreement that New York law would control and that the four principal cases it relies upon all applied New York law. Three of the four cases, *Wichmann, Coudert,* and *Downing,* all to be discussed subsequently did not discuss nor even cite any New York state statutes or case law on the question of arbitrability. Federal case law guided the decision in *Coudert,* which was followed in *Downing* and *Wichmann.* The

fourth case, *Verrier v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* No. 28344/82 (N.Y.Super.Ct. Sept. 26, 1983), applied New York statutory and case law to an arbitrability question. It does not appear, however, that the court was ever asked to consider or did consider the applicability of the United States Arbitration Act. Cf. *Merrill Lynch, Pierce, Fenner & Smith, Inc., v. McKierman,* No. 2039/82 (N.Y.Super.Ct. Jan.29, 1982).

When the arbitration agreement satisfies the requirements of the Arbitration Act then federal law applies to the question of arbitrability even though the parties have selected New York or any other state law to control the interpretation and enforcement of their agreement. *Bell Canada v. IT & T Telecommunications Corp.,* 563 F.Supp. 636, 638 (S.D.N.Y.1983); *Michele Amoruso E. Figli v. Fisheries Development Corp.,* 499 F.Supp. 1074, 1080 (S.D.N.Y.1980); *Rothberg v. Loeb, Rhoades & Co.,* 445 F.Supp. 1336, 1339 (S.D.N.Y.1978); *Romnes v. Bache & Co., Inc.,* 439 F.Supp. 833, 838 (W.D.Wis.1977). *See* also *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lecopolos,* 553 F.2d 842, 845 n. 4 (2nd Cir.1977).

the action to restrain Merrill Lynch from suing her for breach of her employment contract, to compel arbitration under an identical clause in her account executive trainee agreement, and to stay the action pending arbitration. Merrill Lynch counterclaimed to stop Wichmann from using its documents and soliciting its customers. The court ruled that the dispute was not arbitrable because Wichmann's actions allegedly breaching the trainee agreement occurred after she resigned from Merrill Lynch. Since she did not solicit Merrill Lynch clients or provide client information to another brokerage firm until after she left Merrill Lynch the controversy did not arise out of her employment or termination thereof. *Id.* at 5.

DeCaro's view is more subject matter oriented. If the dispute stems from a right or responsibility created by the employment agreement then it is subject to the arbitration clause irrespective of its temporal relationship to termination. He cites *Merrill Lynch, Pierce, Fenner & Smith, Inc., v. Thomson,* 574 F.Supp. 1472 (E.D. Mo.1983) in support of his position. The facts are again similar. Thomson, hired under an identical account executive trainee agreement, resigned from Merrill Lynch and joined another brokerage firm. Merrill Lynch sued to stop the use of documents and information it alleged that Thomson had taken from Merrill Lynch and to stop him from using the information to solicit its clients. Thomson responded by asking the court to compel arbitration. The court ruled in Thomson's favor and ordered arbitration. The court reasoned that the phrase "arising out of" referred to the nature of the dispute and not to its timing. *Id.* at 1476. "The question to be asked is not when did the acts complained of occur, but rather when do the rights and obligations which control the resolution of the dispute arise." *Id.* at 1475. The court ruled that Thomson's non-competition upon leaving Merrill Lynch was a condition of employment and, therefore, covered by the arbitration clause of the trainee agreement and under the rules of the NYSE.

The Eighth Circuit has not yet ruled on this question, although *Wichmann* is currently on appeal. This court believes, however, that the better approach is the approach taken by the Eastern District of Missouri in *Thomson* for several reasons. First, the Supreme Court in *Cone Memorial Hospital,* pointed out that Congress in passing the United States Arbitration Act declared a liberal federal policy favoring arbitration agreements, and "that as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration ...." Second, even without a broad construction of the clause the dispute arose out of the trainee agreement. It is the trainee agreement that obligates DeCaro not to remove or use documents or information available to him while at Merrill Lynch to solicit clients for another brokerage firm. Likewise, it is the trainee agreement that provides Merrill Lynch with a basis for going into federal court to stop any such action on the part of DeCaro. Without the non-competition clauses of the trainee agreement DeCaro could use whatever information he had gathered at Merrill Lynch to solicit Merrill Lynch's clients for his new firm. Third, in an analogous situation the Supreme Court rejected the temporal analysis suggested here by Merrill Lynch. In *Nolde Bros., Inc.,* the Court found that a dispute over severance pay provided for in a collective bargaining agreement arose out of the contract and was subject to the agreement's arbitration clause even though the dispute arose after the agreement had expired. *Nolde Bros., Inc., v. Confectionery Workers Union, AFL–CIO,* 430 U.S. 243, 249, 97 S.Ct. 1067, 1070, 51 L.Ed.2d 300 (1977). The court noted that it had decided in *Wiley & Sons* "that the parties' obligations under their arbitration clause survived contract termination when the dispute was over an obligation arguably created by the expired agreement." *Id.* at 252, 97 S.Ct. at 1072. See *John Wiley & Sons v. Livingston,* 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964). Finally, the court stated that sophisticated parties must be aware of the policy favoring arbitration, there-

fore, if they do not exclude from arbitration contract-based disputes that arise after termination of the contract it indicates an intention and agreement to arbitrate all disputes arising out of the contractual relationship. *Id.* at 255, 97 S.Ct. at 1074. Fourth, the trainee agreement was a form agreement written by Merrill Lynch. Basic principles of contract law support strictly interpreting the agreement against Merrill Lynch. There has been nothing presented to this Court and the Court can not find anything within the agreement that is contrary to the interpretation reached by this and other courts. *See Merrill Lynch, Pierce, Fenner & Smith, Inc., v. Shubert,* 577 F.Supp. 406 (M.D.Fla.1983); *Merrill Lynch, Pierce, Fenner & Smith, Inc., v. deLiniere,* 572 F.Supp. 246 (M.D.Ga.1983). In fact, in *Shubert,* under similar facts, Merrill Lynch did not even contest the arbitrability of the dispute. Lastly sending this dispute to arbitration before the NYSE is consistent with the philosophy that underpins arbitration. It allows arbitrators who are experts in this area and who have seen many of these similar fact situations to resolve the dispute. By being familiar with the customs and practices of the brokerage firms and the securities industry the NYSE arbitrators have an expertise that most courts lack. Arbitration also serves to conserve judicial resources for those disputes where an outside body of experts do not exist.

Merrill Lynch relies on two additional cases to support its position.[8] In the first, *Coudert v. Paine, Webber, Jackson & Curtis,* 705 F.2d 78 (2nd Cir.1983), the two member majority set out a temporal analysis of the scope of an arbitration clause. Coudert, a former account executive with Paine Webber, sued Paine Webber for defamation, invasion of privacy by placing her in a false light, and intentional infliction of emotional distress. She alleged that after she resigned from Paine Webber the office manager informed her that he was con-

sidering her fired as of the previous working day. She also alleged that the office manager made false statements to her former co-workers, Paine Webber clients, and the NYSE regarding the circumstances of her termination. Paine Webber sought to stay the suit pending arbitration. The panel ruled that the false statements, the basis of the action against Paine Webber, did not occur until after Coudert had terminated her employment with Paine Webber, consequently, the resultant dispute was not covered by the arbitration clause contained in the employment agreement. *Id.* at 82. The panel took the position that the parties are not bound to arbitrate a dispute if the events underlying the dispute occurred after the termination of the agreement that created the duty to arbitrate in the first place. *Id.* at 81.

A district court within the Second Circuit applied the *Coudert* analysis to a case factually similar to *DeCaro, Downing v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* No. 83 Civ. 4312 (S.D.N.Y. Aug. 18, 1983). Downing, like DeCaro, left Merrill Lynch for another brokerage firm. Downing, also like DeCaro, was allegedly using documents and information from his employment with Merrill Lynch to solicit clients for his new firm. Downing filed suit to obtain an order compelling arbitration and preventing Merrill Lynch from suing him for breach of the trainee agreement. The court found that the alleged violations did not occur until after Downing had terminated his employment with Merrill Lynch. Relying on *Coudert,* the court ruled that Downing, by resigning, terminated any employment agreement upon which to base a claim for arbitration. *Id.* at 9.

As with *Wichmann,* and for the reasons set out above the Court finds *Coudert* and *Downing* unpersuasive. The temporal analysis of each opinion, looking at the point in time that the events underlying the

---

**8.** Merrill Lynch also relies on *Verrier* as noted in footnote seven. *Verrier,* however, offers no guidance as to the scope of the arbitration clause in question under the United States Arbitration Act and the federal case law previously cited, since it relied on New York law in reaching its decision.

dispute occurred, disregards the arbitration clause phrase "arising *out of* my employment," and substitutes for it arising *during* the term of my employment. Moreover, this narrow temporal view is inconsistent with the liberal approach sanctioned by *Cone Memorial Hospital, supra,* and contrary to the holding in *Nolde Bros., supra.*

*Coudert* and *Downing* are also distinguishable from this action. In *Coudert* the rights and obligations Coudert was trying to enforce were not created by nor arose out of the employment contract, or employer-employee relationship. The office manager in making the alleged false statements did not breach the employment contract; he committed a tortious act. Coudert did not sue for a breach of contract, but for defamation, invasion of privacy, and intentional infliction of emotional distress. On this basis it could be argued that the dispute was not within the scope of the arbitration clause. Here DeCaro has allegedly violated the conditions of his employment with Merrill Lynch. As stated previously DeCaro's obligation not to use Merrill Lynch information to solicit Merrill Lynch's clients and the right of Merrill Lynch to prevent this arises from DeCaro's employment and the trainee agreement he signed.

*Downing* is also distinguishable. First, the trainee agreement did not contain an arbitration clause. "Most importantly for our purposes, the agreement did not contain any provision for arbitration of disputes between the parties." *Downing* at 2. Second, Downing did not satisfy the requirements of the Arbitration Act. Section four of the Act requires that one party to the agreement refuse to arbitrate before the other party can compel arbitration in the courts. Downing had not requested that Merrill Lynch arbitrate prior to filing his action in federal court and simultaneously moving for arbitration. DeCaro's trainee agreement did contain an arbitration clause and DeCaro has filed for arbitration which Merrill Lynch has refused to join. Finally, the *Downing* court itself left doubt as to its exact holding. After stating that even if there had been an arbitration clause in the agreement it would not have covered Downing's post termination actions, the court went on to say that "even if Merrill Lynch should choose to litigate rather than arbitrate, it appears that Downing would be able to defend his interests adequately by obtaining a stay of litigation pending arbitration (if, in fact, he is entitled to such), pursuant to § 3 of the Act, 9 U.S.C. § 3 (1982)." *Downing* at 10. This appears to leave the question of arbitration open for future determination.

## STAY

■ Having determined that the dispute herein is within the scope of the arbitration clause contained in the trainee agreement,[9] the Court now must decide whether to stay any further proceedings pending arbitration or to proceed to hold a hearing on the motion of Merrill Lynch for a preliminary injunction. Section three of the United States Arbitration Act, 9 U.S.C. § 3,[10] requires a court to stay the trial of an action pending arbitration if an issue is referable to arbitration under a written arbitration agreement and if one of the parties to the agreement seeks to arbitrate the issue. The question this Court must decide is whether the language, "shall ... stay the trial of the action," contained in section three, is limited only to a trial on the merits

---

**9.** The Court notes that the scope of the arbitration provisions contained in Form U–4 and NYSE Rule 347 appear to be as broad as the arbitration clause of the trainee agreement.

**10.** Section three of the Act provides:

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

or whether it prohibits all further proceedings before the Court.

Merrill Lynch urges the Court to hold a hearing on its preliminary injunction motion. It maintains that even if the Court chooses to compel arbitration of the dispute it also has the power to enter a preliminary injunction in order to maintain the status quo during the arbitration proceedings. Merrill Lynch cites *Erving v. Virginia Squires Basketball Club,* 468 F.2d 1064 (2nd Cir.1972); *Guinness-Harp Corp. v. Jos. Schlitz Brewing Co.,* 613 F.2d 468 (2nd Cir.1980); *Merrill Lynch, Pierce, Fenner & Smith, Inc., v. The District Court in and for the City and County of Denver,* 672 P.2d 1015 (Colo.1983),[11] in support of its position. Merrill Lynch claims that if this Court does not enter a preliminary injunction nothing will be left to arbitrate.

All three cases stand for the proposition that a court may act to preserve the status quo during arbitration. By implication, they also indicate that at least some courts have not interpreted section three as mandating a cessation of all judicial activity during the pendency of arbitration. Having said all this, however, the Court is not inclined to follow this lead. Two of the three cases have facts that distinguish them from the present action. In *Erving* the Second Circuit upheld an injunctive order that prevented Erving from playing basketball with anyone, but the Virginia Squires while the contract dispute between Erving and the Squires was arbitrated. *Erving v. Virginia Squires Basketball Club,* 468 F.2d at 1067. Different from the present situation is the fact that the contract between Erving and the Squires contained an injunction clause as well as an arbitration clause. *Id.* at 1066 n. 1. The clause gave the Squires the right to enjoin Erving from playing basketball for anyone else, in addition to any other rights possessed by the Squires.[12] A similar contractual difference exists in *Guinness-Harp.* The Second Circuit in *Guinness-Harp* enjoined Schlitz from terminating its distributorship agreement with Guinness-Harp during arbitration. The contract between the parties set up a three step process for terminating the distribution arrangement. Schlitz complied with the first two steps, then proceeded to arbitration at the request of Guinness-Harp, but notified Guinness-Harp that it was terminating the agreement. *Guinness-Harp Corp. v. Jos. Schlitz Brewing Co.,* 613 F.2d at 470. The court after analyzing the contract concluded that the continuation of the distribution arrangement was part of the obligation to arbitrate. "Guinness simply did not agree to arbitration in general; it agreed to arbitration that was to take place before the status quo between the parties had been altered." *Id.* at 472. The trainee agreement does not provide such an intricate dispute resolution mechanism; it provides for "arbitration in general." Moreover, the type of dispute that exists between Merrill Lynch and DeCaro will not usually arise, and did not here, until the relationship of the parties had been altered.

The Colorado Supreme Court case relied upon by Merrill Lynch involved an account executive who left Merrill Lynch for another brokerage firm and the usual allegations by Merrill Lynch that the former employee

**11.** Merrill Lynch also brought *Merrill Lynch, Pierce, Fenner & Smith, Inc., v. Branson* (unreported) (N.Y.Super.Ct.1982); and *Merrill Lynch, Pierce, Fenner & Smith, Inc., v. Klein,* No. 82–0496 (W.D.Mo. July 2, 1982), to this Court's attention. Neither case provides any guidance on the question of proceeding with an injunction hearing during the pendency of arbitration. Although both cases involved facts similar to those underlying the dispute here, in neither case did either party seek arbitration. Consequently, in neither case did the court have to face the issue of determining the extent of a stay pending arbitration.

**12.** The "Injunctive Relief" clause states:

The PLAYER hereby represents that he has special, exceptional and unique knowledge, skill and ability as a basketball player, the loss of which cannot be estimated with any certainty and cannot be fairly or adequately compensated by damages and therefore agrees that the CLUB shall have the right, in addition to any other rights that the CLUB may possess, to enjoin him by appropriate injunction proceedings against playing basketball for any person, firm, corporation or institution, or injunction against any other breach of this contract.

was breaching the terms of his trainee agreement. The court held that the trial court had the power to issue an injunction to preserve the status quo during arbitration and remanded the case to the trial court. *Merrill Lynch, Pierce, Fenner & Smith, Inc., v. The District Court in and for the City and County of Denver,* at 1018–1019. This holding, however, is contrary to other federal and state court cases that have analyzed the same factual situation. *See Merrill Lynch, Pierce, Fenner & Smith, Inc., v. Shubert,* 577 F.Supp. 406 (M.D.Fla.1983); *Merrill Lynch, Pierce, Fenner & Smith, Inc., v. Thomson,* 574 F.Supp. 1472, 1478–1479 (E.D.Mo.1983); *Merrill Lynch, Pierce, Fenner & Smith, Inc., v. Taksler,* 0–3748–83, pp. 20–21 (Sup.Ct.N.J. Sept. 13, 1983); *Merrill Lynch, Pierce, Fenner & Smith, Inc., v. Gorman,* 83 CV 915 p. 5 (Cir.Ct.Wis. Mar. 8, 1983).

This Court finds the position taken in *Shubert, Thomson, Taksler,* and *Gorman* to be the better position. It is more faithful to the purposes of the Arbitration Act and more consistent with the narrow role assigned to the courts.

The Supreme Court has consistently interpreted the Act as providing courts with the narrowest of roles. As noted previously, in determining whether arbitration is appropriate the court is confined to determining whether the claim is within the scope of the contractual, arbitration provision. *United Steelworkers of America v. American Mfg. Co.,* 363 U.S. 564, 567–68, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960). In ruling on the propriety of a stay under section three of the Act, the court is again limited to questions pertaining to the making and performance of the arbitration agreement; all other questions are for the arbitrator. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404, 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270 (1967). The Court has even warned against becoming involved at the preliminary injunction stage of a dispute. *Buffalo Forge Co. v. United Steelworkers of America,*

*AFL–CIO,* 428 U.S. 397, 412, 96 S.Ct. 3141, 3149, 49 L.Ed.2d 1022 (1976).

The decision in *Buffalo Forge* is contrary to the decisions in *Erving, Guinness-Harp,* and *District Court of Denver.* In *Buffalo Forge* the Court declined to enjoin a sympathy strike pending a decision by an arbitrator as to the validity of the strike. An injunction would have had the effect of maintaining the status quo pending the conclusion of arbitration. The Court reasoned that court decisions at the preliminary injunction stage would only serve to eviscerate arbitration agreements. *Id.* at 412, 96 S.Ct. at 3149.

If courts began to hear and rule on preliminary injunction motions pending arbitration it could expand their role. In this circuit a court must consider four factors in ruling on a motion for a preliminary injunction: (1) the probability the movant will succeed on the merits, (2) the possibility of irreparable harm to the movant if the injunction is not granted, (3) the balance of harm to the other parties if the injunction is granted, and (4) the public interest. *Dataphase Systems, Inc. v. C.L. Systems, Inc.,* 640 F.2d 109, 114 (8th Cir.1981). The merits of an arbitrable dispute are for the arbitrator to decide. A court, however, in ruling on a motion for preliminary injunction must consider the merits of the movant's claim and his chances for success. The Court's findings in this regard along with findings in relation to the other factors to be considered would be cited by the parties and could interfere with the arbitrator's independent determination of the issues. *See Thomson, supra,* and *Gorman, supra.* Congress did not visualize the courts having even this large a role under the Arbitration Act. Furthermore, when a court becomes this deeply enmeshed in an arbitrable dispute it is undermining the purpose of the Act. Congress intended to provide parties to contracts involving interstate commerce with a speedy alternative to litigation. *See Cone Memorial Hosp. v. Mercury Construction,* 103 S.Ct. at 941; *Merrill Lynch, Pierce, Fenner & Smith, Inc., v. Thomson,* at 1478. Arbitration was viewed as a quick means to resolve dis-

putes. Allowing a party to pursue injunctive relief where arbitration is appropriate and has been demanded by the other party can only serve to delay the arbitration process. Pursuing injunctive relief in the courts also will require the parties to duplicate their efforts and expend resources intended for the arbitration process. The delay and the additional resources required deprive the party demanding arbitration of the benefits of the contracted for arbitration agreement. Finally, if a preliminary injunction is necessary to protect a party or the status quo the arbitrator has the power to issue an injunction. *See Merrill Lynch, Pierce, Fenner & Smith, Inc., v. Gorman,* 83 CV 915 at 5; Affidavit of Edward W. Morris, Jr., Arbitration Director of the NYSE, Aug. 11, 1983. Having the arbitrator rule on the necessity of a preliminary injunction keeps the court's role to a minimum, avoids unnecessary delay and duplication, and interjects greater expertise into the decision making process.

LOCATION OF ARBITRATION

 The parties also disagree on where arbitration should occur. DeCaro favors New York City and says the Court should grant his wish because he is the party requesting arbitration. Merrill Lynch opts for Kansas City and states that all parties, non-party witnesses, and records are located in Kansas City. If a rule of the NYSE covered this question it would seem that the parties would be bound by it under the terms of the arbitration clause, but since neither party has cited the Court to any NYSE rule that might cover this question the Court assumes that it is within its discretion to weigh the equities and to select a site. Since this Court will maintain jurisdiction of the case pending arbitration and since DeCaro has not challenged Merrill Lynch's claim that all parties, non-party witnesses, and records are in Kansas City, Kansas City appears to be the appropriate forum.

Accordingly the Court

ORDERS the parties to submit to arbitration under the terms and conditions of the arbitration clause of the "Account Ex-ecutive Trainee Agreement" entered into by the parties. The Court further

ORDERS the New York Stock Exchange to convene a panel on an expedited basis to hear this dispute. The panel shall convene in Kansas City. Finally, the Court

ORDERS all proceedings before this Court to be stayed during the pendency of the arbitration. Consistent with the stay the Court declines to hear the motion of Merrill Lynch for a preliminary injunction, without taking a position on the merits of the motion.