**MAYOR and City Council of Baltimore, et al.**

v.

**BALTIMORE CITY COMPOSTING PARTNERSHIP, et al.**

Civ. No. JFM–92–1553.

United States District Court, D. Maryland.

July 31, 1992.

Neal M. Janey, Office of the Mayor & City Council of Baltimore, Deborah Howland Young Skupien, Jordan, Coyne, Savitz & Lopata, Stewart K. Diana, Francis B. Burch, Jr., Kurt J. Fischer, Martha D. Harting, Piper and Marbury, Baltimore, Md., for plaintiffs.

Alan M. Grimaldi, Gary H. Nunes, Scott A. Scheele, Howery and Simon, Washington, D.C., for defendants.

## OPINION

MOTZ, District Judge.

This action arises under an agreement between the City of Baltimore ("the City") and the Baltimore City Composting Partnership ("BCCP") for the processing and disposal of sewage sludge.[1] BCCP claims that it is entitled to be compensated for certain costs which it allegedly has incurred or will incur as a result of the occurrence of several "uncontrollable circumstances" as defined in the Agreement. The City has refused to pay these claims and instituted this action for the purposes of declaring the parties' respective rights and obligations in regard to the claims and to enjoin BCCP from submitting the claims to arbitration. Presently pending before me are a motion for preliminary injunction filed by the City and a motion to dismiss or for a stay (pending arbitration) filed by BCCP.

---

1. The formal parties to the contract are BCCP and an entity known as "Northeast Maryland Waste Disposal Authority." However, in a related sludge disposal agreement, the City effectively assumed the rights and obligations of the Authority under the Agreement. Because the dispute is essentially between the City and BCCP, I have referred to "the City" rather than to "the Authority" throughout this opinion, and have substituted the former for the latter, without the use of ellipsis points and brackets, when quoting from relevant provisions of the Agreement. I should also note that the Authority is named as a plaintiff and that Research–Cottrell, Inc. which guaranteed certain obligations of BCCP under the contract, is named as a defendant in this action.

## I.

The City and BCCP entered into the Agreement as of December 1, 1985. Under the terms of the Agreement BCCP acquired, constructed, owns and operates a facility to dispose of the City's (and Baltimore County's) sewage sludge. The facility has been operational since 1987.

Over the years the relationship between the parties has not been a happy one. The facility has experienced numerous operating problems and has been cited for violations of environmental and safety regulations by various public authorities. The City has not been satisfied with its performance. At the same time BCCP has been forced to incur substantially greater costs than it apparently anticipated.

Under the Agreement BCCP is paid a "Tipping Fee," consisting of a "Base Tipping Fee" component and an "Additional Tipping Fee" component. The Base Tipping Fee covers the net debt service under revenue bonds which were issued for the purpose of financing the acquisition and construction of the disposal facility. It is paid to the trustee under the bond indenture. The "Additional Tipping Fee" consists of a fixed per-ton amount plus a defined factor for operating and maintenance expenses. It is paid to BCCP.

The agreement further provides for a mechanism by which BCCP may be compensated for additional capital and operating expenses which it is required to incur as a result of certain defined "uncontrollable circumstances." In 1991 BCCP began suggesting that many of the costs which it had incurred and would incur in the future resulted from the occurrence of such uncontrollable circumstances. Following up on those suggestions, in March 1992 BCCP wrote letters to the City outlining three alleged uncontrollable circumstances: (1) excessive building corrosion resulting from the receipt of lime-stabilized sludge, abnormal weather conditions (excess rain and air temperature) and acid rain, (2) more stringent stormwater management requirements imposed by the Maryland Department of the Environment and (3) changed air pollution control requirements established by the Department. BCCP estimated that it had incurred approximately $6,275,000 in capital and operating costs as a result of those circumstances.

Section 6.9(b) of the Agreement provides, in part, that BCCP "shall answer any inquiries of the City regarding the conditions caused by the Uncontrollable Circumstances or the Additional Capital Investment and shall provide it with such information as it reasonably requests." Pursuant to that section the City wrote to BCCP on March 30, 1992 requesting that it provide specific information to support its claims. On April 24, 1992, BCCP wrote back to the City. Its only reference to the City's request for information was oblique:

> We are ready to provide you with any further back-up data you may reasonably request to further substantiate any and all components of this claim. Given that you are intimately familiar with these issues, we expect that your questions will be minimal and we will not accept any 'information requests' as reasons for delay in processing our invoices. *Any such delays will be considered bad faith and a direct violation of Section 6.7 of the Service Agreement.*

Instead of providing the City with the information which it requested, BCCP reiterated the three alleged uncontrollable circumstances, significantly increased its estimate of resulting capital and operating costs, added a claim of $400,000 for lost sales revenues, proposed an adjustment to the Tipping Fee, presented forward-dated invoices for April, May and June, 1992 and demanded payment of the adjusted Tipping Fee for April as of May 28, 1992.

BCCP also stated in its April 24th letter that "[t]he costs for which we are demanding reimbursement are not financeable and have no useful life ..." and that it was therefore adjusting the Tipping Fee to recover all capital costs "for the current year." This statement was significant because Section 6.9 of the Agreement requires BCCP to finance (in a manner suggested by the City), if reasonably possible, capital costs necessitated by an uncontrollable circumstance. Therefore, in asserting

that the costs covered by its uncontrollable circumstances claims cannot be financed and seeking immediate reimbursement for them, BCCP was radically modifying the basic financial structure upon which the Agreement is built.

BCCP again wrote to the City on May 4, 1992. In that letter BCCP directly referred to the request for information contained in the City's March 30, 1992 letter: "[a]s we advised you in our April 24 letter, we will not tolerate superfluous 'information requests ... Stop asking us for unreasonable data. You have sufficient facts.'" Three days later BCCP again wrote to the City and increased its claims, this time by $725,000.

Section 6.7 of the Agreement provides as follows:

> Until the resolution of any disagreement about any Tipping Fee adjustment, the Company's proposed adjustment shall be effective. The Company shall, immediately after the resolution, reimburse the City for the aggregate amount of any overpayment, plus interest at the Late Payment Rate.

The City has not paid the invoices which BCCP has submitted in connection with its uncontrollable circumstances claim. It acknowledges that, by failing to do so, it has not complied with the terms of Section 6.7. However, it contends that its action is fully justified on the grounds that BCCP has not provided it with information which it has requested pursuant to Section 6.9(b) and that BCCP's submission of the claims constitute an abuse of the Agreement's provisions pertaining to the adjustment of the Tipping Fee.

## II.

The motions presently pending before me do not require resolution of the merits of the underlying controversy concerning the legitimacy of BCCP's claims. Rather, they simply raise the question of whether BCCP may compel the City to arbitrate that controversy.

The broad principles governing that question are simple and straightforward.[2] The intentions of the parties to a contract are to be "generously construed as to issues of arbitrability." *Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.*, 867 F.2d 809, 813 (4th Cir.1989). However, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Id.* at 812. Where a narrow, rather than a broad, arbitration clause is involved, courts generally scrutinize the contract more closely to determine whether the parties intended that a particular dispute be arbitrated. *See, e.g., McDonnell Douglas Finance v. Pennsylvania Power & Light Co.*, 858 F.2d 825, 832 (2d Cir.1988).

The Agreement between the City and BCCP contemplates that many disputes arising under it will be resolved by arbitration. It specifies fourteen instances in which either one or both of the parties can resort to binding arbitration. However, the arbitration clause itself (Section 15.-15(b)) is narrow rather than broad in its terms. It does not provide that all disputes are to be referred to arbitration. Rather, it states that "[w]here expressly provided in this Agreement, the City or the Company (as the case may be) may refer a dispute to

---

**2.** The parties disagree as to whether federal or Maryland law applies to the arbitration question. The City argues that federal law applies since the Agreement evidences a transaction "involving interstate or foreign commerce." *See Varley v. Tarrytown Assoc., Inc.*, 477 F.2d 208, 209 (2d Cir.1973); *Merrill Lynch, etc., Inc. v. DeCaro*, 577 F.Supp. 616, 619 (W.D.Mo.1983). BCCP argues, on the other hand, that Maryland law should apply in light of the fact that Section 15.9 of the Agreement provides that "[t]he laws of Maryland shall govern the validity, interpretation, construction and performance of this

Agreement," and that Section 15(b) provides that "[t]he time, place, rules and procedures to be followed to elicit the information and evidence required hereunder shall be consistent with the provisions of the Maryland Uniform Arbitration Act." *See Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989). I need not decide this question since both parties have cited federal cases and do not suggest that Maryland law differs from federal law in any material respect.

the Independent Consultant under this Section 15.15."

Five sections of the Agreement are directly pertinent here. The first is Section 6.7, quoted above, which provides that any adjustment to the Tipping Fee proposed by BCCP shall be effective until the resolution of any dispute concerning it. Also germane are Sections 6.9(b) and 6.9(d) which confer upon the City alone the right to refer to arbitration disputes concerning capital costs allegedly required by an uncontrollable circumstances. They provide, in relevant part, as follows:

*Section 6.9(b):* The Company recognizes the interest of the City in assuring the prompt restoration of normal Facility operations. Promptly after the occurrence of the Uncontrollable Circumstance, the Company shall give the City a statement describing the Uncontrollable Circumstances, its cause (to the extent known to the Company) and a description of the conditions delaying the performance of the Company's obligations. As soon as reasonably practical thereafter, the Company will provide the City with an estimate of any Additional Capital Investment.... The Company shall answer any inquiries of the City regarding the conditions caused by the Uncontrollable Circumstances or the Additional Capital Investment and shall provide it with such information as it reasonably requests. If the City believes, after consultation with appropriate professional consultants, that the estimate by the Company of the Additional Capital Investment is unreasonable, and the City and the Company cannot agree, it may refer the matter to dispute resolution pursuant to Section 15.15. If the Independent Consultant determines that the estimate is unreasonable, the estimated Additional Capital Investment shall be reduced to an amount determined by the Independent Consultant to be a reasonable estimate.

*Section 6.9(d):* After any Additional Financing or Refinancing ..., the Base Tipping Fee Payment shall be adjusted to reflect an amount equal to annual scheduled principal and interest payments on any indebtedness incurred by the Company under any Additional Financing or Refinancing. If the Company cannot finance any Additional Capital Investment or Fixed Construction Price Adjustment, the amount of increase to the Base Tipping Fee Payment for each Fiscal Year shall equal (i) the annual debt service ... [calculated pursuant to a defined formula] or (ii) any other amount approved by the City and the Company. The computation of any such adjustment described in reasonable detail, shall be delivered by the Company to the City at least ten (10) days before the proposed adjustment is to take effect. If the City believes, after consultation with appropriate consultants, that such computation of the Company is incorrect, and the City and the Company cannot agree, the City may refer the matter to dispute resolution pursuant to Section 15.15. The computation of such adjustment may be revised by the Independent Consultant.

Section 6.10 applies to increased operating costs which result from the occurrence of an uncontrollable circumstance. While substantially parallelling the similar provisions in Section 6.9 pertaining to increased capital costs, it combines in a single subsection the provisions of 6.9(b), pertaining to disputes over the reasonableness of an estimate, and the provisions of 6.9(d), pertaining to the accuracy of computations. Specifically, Section 6.10(c) provides, in relevant part, as follows:

If the City believes, after consulting with appropriate professional consultants, that the amount of the adjustment is not reasonable or that the computation of such adjustment is incorrect, and the City and the Company cannot agree, the City may refer the matter to dispute resolution pursuant to Section 15.15. The Tipping Fee shall not be adjusted by any amount that the Independent Consultant determines to be unreasonable or the result of an incorrect computation by the Company.

The final provision upon which the parties have focused appears in Section 6 to Schedule 6 of the Agreement. That section

applies to the calculation and payment of monthly invoices. Its final clause states:

> In the event the City disagrees with the amount of an invoice as calculated by the Company, the City shall pay the undisputed amount in accordance with the instructions of the Company included in such invoice. If the parties are unable to resolve their disagreement, either party may refer the dispute to the Independent Consultant pursuant to Section 15.5 of the Agreement.

## III.

### A.

■ The parties' respective positions may be briefly stated. The City contends that under Sections 6.9 and 6.10, it is the only party which can submit to arbitration a dispute concerning increased costs allegedly caused by uncontrollable circumstances. BCCP argues, on the other hand, that where the parties' dispute about an adjustment to the Tipping Fee culminates in the City's refusal to pay invoices submitted by BCCP reflecting the adjustment, either party may submit the dispute to arbitration under Section 6 of Schedule 6.

As a threshold matter, I question whether either party has the right to submit to arbitration (at least without the consent of the other) a dispute concerning *the occurrence* of an alleged uncontrollable circumstance. By their terms Section 6.9 and 6.10 authorize the City to submit to arbitration only disputes concerning the reasonableness and accuracy of *the amount* of increased costs allegedly resulting from such a circumstance.[3] Assuming, however, that the City may submit to arbitration the question of the occurrence of an uncontrollable circumstance, as well as the question of the reasonableness and accuracy of any increased cost allegedly resulting therefrom, I am fully satisfied that it is only the City which has that right.

Sections 6.9 and 6.10 could not be more explicit in stating that in the event of a dispute concerning the reasonableness or accuracy of a proposed adjustment to the Tipping Fee, it is the City alone which may submit the dispute to arbitration. Section 15.15(b), the overarching arbitration provision, does not confer a general reciprocal right upon a party not expressly given the right to arbitrate but only implements arbitration rights established independently by other provisions of the Agreement. Of course, the reason that BCCP may not have pressed during the contract negotiations to be granted the right to arbitrate under Section 6.9 and 6.10 is apparent. It may well have believed that it had provided sufficient protection for itself through inclusion of Section 6.7 which, by providing that BCCP's proposed adjustments to the Tipping Fee are to be effective pending the resolution of any dispute, places the onus upon the City in the ordinary course to seek arbitration if it disagrees with any proposed adjustment.

■ BCCP's subjective motivations, however, cannot provide the basis for construing the terms of the Agreement. The City admits that it has not complied with the directive of Section 6.7 that it give effect to BCCP's proposed adjustments pending resolution of the parties' dispute. If its action in that regard is unjustified, it will have to live with the legal consequences, whatever they may prove to be. However, the City's noncompliance with Section 6.7 does not *ipso facto* confer any right to arbitrate upon BCCP. If that right exists, it must be found elsewhere in the Agreement.

BCCP attempts to find its right to arbitrate in Section 6, Schedule 6. As indicated above, it argues that it has submitted invoices to the City in order to obtain payment of the proposed adjustments which it has made to the Tipping Fee and that the City's refusal to pay those invoices gives either party the right under Section 6 of Schedule 6 to have the dispute arbitrated. There are two fallacies in this argument. First, BCCP's interpretation of Section 6 of

---

**3.** Section 15.1 of the Agreement likewise reflects, albeit indirectly, that the parties did not contemplate that the essentially legal question of whether an uncontrollable circumstance has occurred is arbitrable. That section, which excuses a party from performance if an uncontrollable circumstance has occurred, contains no arbitration clause.

Schedule 6 would render the provisions of Section 6.9(b), 6.9(d) and 6.10(c) superfluous. Second, Section 6 of Schedule 6, as interpreted by BCCP, cannot be squared with Section 6.7 itself since by its terms it would authorize the City to pay only the undisputed amount of the invoices submitted by BCCP despite Section 6.7's mandate that BCCP's proposed adjustments to the Tipping Fee are effective pending resolution of any dispute and are therefore immediately payable.

BCCP seeks to overcome the obstacles to its interpretation of the Agreement by contending that Section 6 of Schedule 6 should be considered as following sequentially in time to Section 6.9 and Section 6.10. Its argument runs as follows: Sections 6.9 and 6.10 give the City a ten day period after receiving notice of a proposed adjustment to submit any issues raised by the proposal to arbitration; if the City does not seek arbitration within that ten day period, the proposed adjustment becomes effective under Section 6.7 and the City must pay invoices reflecting the adjustment pending the resolution of any subsequent dispute; but if the City does seek arbitration within the ten day period, the proposed adjustment does not become effective and if it is included in an invoice submitted by BCCP, the City need pay only the undisputed amount of the invoice under Section 6 of Schedule 6.

Aside from being somewhat convoluted on its face, this interpretation of the Agreement is flawed in two respects. First, its premise is wrong. There is nothing in Section 6.9(b) relating to disputes over the reasonableness of increased capital cost estimates which even suggests that the City has only ten days in which to seek arbitration of disputed issues. Moreover, although Section 6.9(d), relating to the accuracy of cost computations, and Section 6.10(c), relating both to the reasonableness and accuracy of operating cost calculations, does require BCCP to give notice of proposed adjustments at least ten days before they are to take effect, they do not explicit-

ly require the City to submit any dispute to arbitration within the ten day period. Nor can they reasonably be said to implicitly do so, particularly since, as the magnitude of the claims submitted by BCCP in this case indicates, the issues presented by a proposed adjustment can be extensive and complex and hardly capable of responsible review within ten days.[4]

The second fallacy in BCCP's argument is equally fundamental. Even if BCCP's interpretation of Section 6.9 and Section 6.10 were correct, there is nothing in Section 6.7 which suggests that a proposed adjustment is not to become effective simply because the City has timely sought arbitration as to the issues which it disputes. Rather, that section states very plainly that the proposed adjustment is to be effective "until the resolution of any disagreement."

### B.

The City's position is far more straightforward and easily reconciles Section 6 of Schedule 6 and Section 6.7 with one another. As construed by the City, Section 6 of Schedule 6 applies only to the myriad of disputes which can arise under the formulae and computations involved in the invoicing process itself—the process defined and implemented by Schedule 6.

BCCP complains, however, that if the City's interpretation of the Agreement is accepted as conferring only upon the City the right to submit uncontrollable circumstance claims to arbitration, the Agreement is one-sided. The short answer to that complaint is that if BCCP were concerned about one-sidedness, it should have negotiated the Agreement differently. Moreover, as the facts of this case themselves demonstrate, the alleged one-sidedness is far less arbitrary than it may at first appear.

An uncontrollable circumstance claim, which may involve millions of dollars, necessarily is based upon information exclu-

---

**4.** I might note that during the course of his rebuttal argument at the hearing held in this case, counsel for BCCP admitted that Sections 6.9(d) and 6.10(d) can be read as not imposing any requirement upon the City to seek arbitration within a ten-day period.

sively within BCCP's possession. Under Section 6.9(b) the City may (at least in regard to alleged capital costs) seek information from BCCP concerning the conditions caused by an alleged uncontrollable circumstance and the costs which it allegedly has engendered. However, BCCP might choose not to be forthcoming in its responses, in order to prevent the City from making a thorough and responsible evaluation of the asserted claims before being ambushed during the relatively informal process of arbitration. If the City were to conclude that BCCP had decided to follow that course of action, it could quite properly decide that it should forego arbitration and take action which would require resolution of the claims in a court action where it would have the tools of discovery available to it. That is precisely what the City did decide here. In doing so, it acted within its rights under the Agreement.

A separate order is being entered herewith denying BCCP's motion to dismiss or to stay and granting the City's motion for preliminary injunction.

## ORDER

For the reasons stated in the opinion entered herein, it is this 31st day of July 1992

ORDERED

1. Defendants' motion to dismiss or for a stay is denied; and

2. Plaintiffs' motion for a preliminary injunction is granted.